### IN the INTEREST OF D.W. and K.W., Children

### No. 06–16–00076–CV

Court of Appeals of Texas, Texarkana.

Date Submitted: March 30, 2017

Date Decided: March 31, 2017

Rehearing Granted and Opinion Substituted March 31, 2017.

Ebb B. Mobley, Attorney at Law, P O Box 2309, Longview, TX 75606, Alex Tyra, Law Office of Alex Tyra, PC, P O Box 3653, Longview, TX 75606, for Appellant.

Michael D. Becker, Office of General Counsel, TDFPS MC: Y-956, 2401 Ridgepoint Dr, Bldg H–2, Austin, TX 78754, for Appellee.

Before Morriss, C.J., Moseley and Burgess, JJ.

## OPINION

Opinion by Justice Burgess

We issued an opinion and judgment in this matter on February 8, 2017. The Appellee timely filed a motion for rehearing, and the Appellants, at our request, filed a joint response to that motion for rehearing. We hereby grant the Appellee's motion for rehearing, we withdraw our opinion and judgment issued on February 8,

2017, and, in its place, substitute the following opinion and contemporaneously issued judgment.

Mother and Father appeal the trial court's decision to terminate their parental rights to their children, D.W. and K.W.[1] Because we conclude that the trial court had jurisdiction to enter the order terminating their parental rights, we affirm the trial court's judgment terminating Father's parental rights. Because we further find that there is factually sufficient evidence to support the trial court's judgment that termination of Mother's parental rights was in D.W.'s and K.W.'s best interests, we also affirm the trial court's judgment terminating Mother's parental rights.[2]

## I. Factual and Procedural Background

### A. The 2011–12 Upshur County Suit Affecting the Parent–Child Relationship (SAPCR) Proceeding

In March 2011, the Texas Department of Family and Protective Services (the Department) filed a petition seeking protection of D.W. and K.W. under Chapter 262 of the Texas Family Code, along with a petition seeking termination of the parent-child relationship, in the 115th Judicial District Court of Upshur County, Texas (115th JDC). In March 2012, the 115th JDC entered a final order in the SAPCR. Among other things, the 115th JDC adjudged Father as the sole managing conservator of the children, ordered Mother to pay child support, and dismissed the Department as a party to the suit.

Section 155.001 of the Texas Family Code confers jurisdiction "over the parties and subject matter of a suit affecting the

parent-child relationship." *In re G.A.J.*, No. 01-12-00256-CV, 2012 WL 4857925, at *2 (Tex. App.–Houston [1st Dist.] Oct. 11, 2012, no pet.) (mem. op.); *see Saavedra v. Schmidt*, 96 S.W.3d 533, 540 (Tex. App.–Austin 2002, no pet.). Once a Texas court has acquired continuing, exclusive jurisdiction under Section 155.001, "no other court of this state has jurisdiction of a suit with regard to [the children] except as provided by [Chapter 155], Section 103.001(b), or Chapter 262." TEX. FAM. CODE ANN. § 155.001(c) (West Supp. 2016). Accordingly, when the 115th JDC entered the March 2012 final order in the SAPCR, it "acquire[d] continuing, exclusive jurisdiction over the matters ... in connection with the child[ren] on the rendition of [the] final order." TEX. FAM. CODE ANN. § 155.001(a) (West Supp. 2016).

### B. The Gregg County Proceeding

On March 2, 2015, the Department filed a petition seeking protection of D.W. and K.W. under Chapter 262 of the Texas Family Code, along with a petition seeking termination of the parent-child relationship, in the 307th Judicial District Court of Gregg County, Texas (307th JDC). While the petition asserted that the 307th JDC had jurisdiction over the matter under Chapter 262, it also recited that the 115th JDC had continuing, exclusive jurisdiction under Section 155.001.

On March 2, 2015, the 307th JDC signed an emergency order for protection of the children and set March 10, 2015, as the date of the full adversary hearing. Following that hearing, the 307th JDC entered temporary orders appointing the Department as temporary managing conservator of the children. Subsequently, the 307th

---

1. To protect the identity of the children, we will not include the names of the parties in this opinion. *See* TEX. R. APP. P. 9.8.

2. Father only challenged the trial court's jurisdiction to issue the order terminating his parental rights. Accordingly, we only address the jurisdictional question as to Father.

JDC also set the final trial on the Department's petition to terminate Mother and Father's parental rights to D.W. and K.W.

On July 11, 2016, the Department filed a motion that informed the 307th JDC that the 115th JDC had continuing, exclusive jurisdiction. The Department asked the 307th JDC to transfer the 115th JDC's jurisdiction to itself. Father objected to the Department's motion, stating that the proper procedure would be to file a motion in the 115th JDC requesting that court to transfer the matter to the 307th JDC. After the 307th JDC heard the motion to transfer and the opposition to the motion, it granted the Department's motion and entered an August 9, 2016, order purporting to transfer jurisdiction from the 115th JDC to itself. Because the 115th JDC had not entered any order transferring its jurisdiction to the 307th JDC, Father filed a motion to dismiss the case in the 307th JDC for want of jurisdiction on August 19, 2016. The 307th JDC denied Father's motion to dismiss and set the matter for final hearing.

On August 10, 2016, the District Clerk for the 115th JDC transferred its files to the 307th JDC, under Section 155.204(i), which provides,

> If a transfer order has been signed by a court exercising jurisdiction under Chapter 262, a party may file the transfer order with the clerk of the court of continuing, exclusive jurisdiction. On receipt and without a hearing, the clerk of the court of continuing, exclusive juris-

diction shall transfer the files as provided by this subchapter.

TEX. FAM. CODE ANN. § 155.204(i) (West 2014).[3] On August 23, 2016, the 307th JDC held the final hearing on the Department's Chapter 161 petition for termination of parental rights and, on September 23, 2016, entered an order terminating Mother and Father's parental rights to their children.

## II. Father's and Mother's Point of Error Number One—Did the Trial Court Have Jurisdiction to Enter the Final Orders Under Section 262.203(a)(2)?

### A. Introduction

Under Chapter 262, the Department may, under certain circumstances, take emergency possession of children without prior notice and a hearing. TEX. FAM. CODE ANN. § 262.001 (West 2014). Even though a different court may have continuing, exclusive jurisdiction under Chapter 155, a suit brought by a governmental entity requesting an order under Chapter 262 "may be filed in a court with jurisdiction to hear the suit in the county in which the child is found." TEX. FAM. CODE ANN. § 262.002 (West 2014). Chapter 262 authorizes a trial court to enter emergency orders and other temporary orders. TEX. FAM. CODE ANN. §§ 262.102–.103 (West Supp. 2016). Therefore, the 307th JDC had jurisdiction to enter emergency orders and temporary orders regarding D.W. and K.W.

However, the 307th JDC went further and entered a final order terminating both

---

3. A letter from Karen Bunn, District Clerk for the 115th JDC, explained that the clerk's office had received a motion to transfer the case to the 307th JDC, along with a proposed order, on August 9, 2016, but that the order was never signed by the judge of the 115th JDC because "it needed to be sent to the CPS Judge by mail for her signature." The letter further explained that, even though there was no order from the 115th JDC transferring its continuing, exclusive jurisdiction to the 307th JDC, Bunn decided simply to forward the files on the insistence of the judge of the 307th JDC who stated that "a hearing had already been set" and that "the case had to be transferred that day to Gregg County under the circumstances of this case" and Chapter 262 of the Texas Family Code.

parents' parental rights, which is the subject of this appeal. Accordingly, the first issue presented in this case is whether the 307th JDC also had jurisdiction to enter the final, parental-rights termination order. Resolution of that issue turns on whether the original SAPCR proceeding in the 115th JDC was properly transferred to the 307th JDC.

## B. Application

Resolution of this issue involves the interaction between Chapters 155 and 262 of the Texas Family Code. When the Department files a suit under Chapter 262 in "a court with jurisdiction to hear the suit in the county in which the child is found," and the Chapter 262 court is not the court of continuing, exclusive jurisdiction under Chapter 155, the Chapter 262 court may enter emergency orders, hold a full adversary hearing, and enter temporary orders. TEX. FAM. CODE ANN. §§ 262.002, 262.102, 262.202 (West Supp. 2015). However, once the Chapter 262 court issues a temporary order after a full adversary hearing, then the Department *"shall* request identification of a court of continuing, exclusive jurisdiction as provided by Chapter 155." TEX. FAM. CODE ANN. § 262.202 (emphasis added). And if the Chapter 262 court determines the identity of a court of continuing, exclusive jurisdiction in response to that request, then under Section 262.203, the Chapter 262 court *shall*, "[o]n the motion of a party or the court's own motion, if applicable ... (1) transfer the suit to the court of continuing, exclusive jurisdiction, if any." TEX. FAM. CODE ANN. § 262.203 (West Supp. 2016) (emphasis added). Upon transfer of the Chapter 262 suit to the court of continuing, exclusive jurisdiction, the court of continuing, exclusive jurisdiction shall then proceed to hear the remainder of the suit and enter the

final orders under the provisions of Chapter 155. *See id.*

Thus, as to emergency and temporary orders, the Chapter 262 court shares jurisdiction with the Chapter 155 court of continuing, exclusive jurisdiction, but not as to final orders. In order for the Chapter 262 court to acquire jurisdiction to enter a final order, the original case in the court of continuing, exclusive jurisdiction must be transferred to the Chapter 262 court. The transfer of cases from courts of continuing, exclusive jurisdiction is governed by Chapter 155, subchapter C. *See* TEX. FAM. CODE ANN. §§ 155.201–.207 (West 2014 & Supp. 2016) (entitled "Transfer of Continuing, Exclusive Jurisdiction"). Those provisions hold that the court of continuing, exclusive jurisdiction shall decide all motions to transfer, not the court to which the transfer will be made. *Cf.* TEX. FAM. CODE ANN. § 155.201(a) (West 2015) ("On the filing of a motion ... requesting a transfer ... the court having continuing, exclusive jurisdiction of a suit affecting the parent-child relationship shall ... transfer the proceedings ..."); TEX. FAM. CODE ANN. § 155.206(a) (West 2015) ("A court to which a transfer is made becomes the court of continuing, exclusive jurisdiction and all proceedings in the suit are continued as if it were brought there originally.").

However, Chapter 262 creates a limited exception to the rule that the court of continuing, exclusive jurisdiction decides all transfer motions. Namely, where the Chapter 262 court (1) enters a temporary order after a full adversary hearing, (2) determines the identity of a court of continuing, exclusive jurisdiction under Section 262.202, and (3) further determines that "grounds exist for mandatory transfer from the court of continuing, exclusive jurisdiction under Section 155.201," then the Chapter 262 court shall order transfer of

the suit from that court of continuing, exclusive jurisdiction. Tex. Fam. Code Ann. § 262.203(a)(2). When the Chapter 262 court enters a transfer order under Section 262.203(a)(2), then "a party may file the transfer order with the clerk of the court of continuing, exclusive jurisdiction" and "[o]n receipt and without a hearing, the clerk of the court of continuing, exclusive jurisdiction shall transfer the files" to the Chapter 262 court. Tex. Fam. Code Ann. § 155.204(i). Other than this narrow exception, the court of continuing, exclusive jurisdiction decides whether to transfer the case to another court, not the Chapter 262 court.[4]

4. Although no active suit was pending in the 115th JDC at the time the 307th JDC issued the order of transfer, Section 262.203(a)(2) states that "if grounds exist for mandatory transfer from the court of continuing, exclusive jurisdiction under Section 155.201," the Chapter 262 court shall "order transfer of *the suit* from that court." Tex. Fam. Code Ann. § 262.203(a)(2) (emphasis added). Therefore, the question arises, what is "the suit" which is being transferred under Section 262.203(a)(2)? Is it the Chapter 262 suit before the court under Section 262.203, or is it some other suit pending in the court of continuing, exclusive jurisdiction? Stated another way, does Section 262.203(a)(2) require that another suit be pending in the court of continuing, exclusive jurisdiction before that section applies?

It is clear from the language in Section 262.203(a), subsections (1) and (3), that the phrase "the suit" refers to the Chapter 262 suit itself, not to some other suit in the court of continuing, exclusive jurisdiction:

> On the motion of a party or the court's own motion, if applicable, the court that rendered the temporary order shall in accordance with the procedures provided by Chapter 155:
>
> (1) transfer *the suit* to the court of continuing, exclusive jurisdiction, if any:
>
> ....
>
> (3) if grounds exist for transfer based on improper venue, order transfer of *the suit* to the court having venue of the suit under Chapter 103.

Tex. Fam. Code Ann. § 262.203(a)(1), (3). In both scenarios covered by subsections (1) and (3), there is no suit to transfer other than the Chapter 262 suit; both subsections (1) and (3) contemplate the Chapter 262 court transferring the Chapter 262 suit pending before it to some other court. Moreover, there is nothing in the statute indicating the legislature intended the term "the suit" used in subsection (2) to have a different meaning than that used in subsections (1) and (3). Consequently, under subsection (2) the suit that is being transferred to the Chapter 262 court is the Chapter 262 suit itself.

This conclusion becomes even more clear when Section 262.203(a), subsections (1) and (2), are read together. Under subsection (1), the Chapter 262 court will transfer the Chapter 262 suit to the court of continuing, exclusive jurisdiction. However, if grounds for mandatory transfer to the Chapter 262 court exist under Section 155.201(b), then rather than transfer the Chapter 262 suit to the court of continuing, exclusive jurisdiction only to have that court immediately transfer the suit back to the Chapter 262 court under Section 155.201(b), subsection (2) allows the Chapter 262 court to simply transfer the Chapter 262 suit to itself. Therefore, Section 262.203(a)(2) applies even if no active case is pending in the court of continuing, exclusive jurisdiction.

Nothing in Chapter 155 is inconsistent with this interpretation. Although Section 262.203(a) states that transfer under that statute shall be made "in accordance with procedures provided by Chapter 155," Tex. Fam. Code Ann. § 262.203(a)(1), (3), and although Section 155.201(b) applies "[i]f a suit to modify or a motion to enforce an order is filed in the court having continuing, exclusive jurisdiction of a suit," Tex. Fam. Code Ann. § 155.201(b), that introductory language in section 155.201(b) is not a procedure by which transfer is effected but is merely a statement identifying those instances in which a transfer can occur under that section. The grounds for transfer under Section 155.201(b) are "if the child has resided in the other county for six months or longer." Tex. Fam. Code Ann. § 155.201(b). The procedures for transfer are found in Sections 155.204 through 155.207. Accordingly, neither Sections 155.201(b) nor 262.203(a)(2) require that another suit be pending in the court of continuing, exclusive jurisdiction in order to effect a transfer. Rather, Section 262.203(a)(2) merely creates another limited instance in which mandatory transfer from the court of continuing, exclusive jurisdiction under Section 155.201(b) can occur.

■ The Department relies on the 307th JDC's August 9, 2016, order purporting to transfer jurisdiction to itself. Although the record does not reflect that grounds existed for a mandatory transfer from the 115th JDC under Chapter 155, the Department argues that it timely filed a motion to transfer and that Mother and Father failed to file controverting affidavits. Under Section 155.204(c),

> If a timely motion to transfer has been filed and no controverting affidavit is filed within the period allowed for its filing, the proceeding shall, not later than the 21st day after the final date of the period allowed for the filing of a controverting affidavit, be transferred without a hearing to the proper court.

TEX. FAM. CODE ANN. § 155.204(c). We have held that "[t]ransfer of a SAPCR action to a county where the child has resided for more than six months is a mandatory ministerial duty under Section 155.201(b) of the Texas Family Code." *In re Kerst*, 237 S.W.3d 441, 443 (Tex. App.–Texarkana 2007, orig. proceeding). Thus, where a party files a motion to transfer venue under Section 155.201(b) and the other party fails to file a controverting affidavit, "[t]he trial court [has] a mandatory duty to transfer the case" to the county where the child has resided for more than six months. *In re Kramer*, 9 S.W.3d 449, 451 (Tex. App.–San Antonio 1999, orig. proceeding).

■ Because the Department filed a motion to transfer and because Mother and Father did not file controverting affidavits, "grounds exist[ed] for mandatory transfer from the court of continuing, exclusive jurisdiction under Section 155.201." TEX. FAM. CODE ANN. § 262.203(a)(2). Accordingly, the trial court properly transferred the suit to itself and acquired jurisdiction to enter final orders. Father's and Mother's first point of error is overruled.

### III. Mother's Point of Error Number Two—Was There Factually Sufficient Evidence to Support the Trial Court's Determination that Termination of Mother's Parental Rights Was in D.W.'s and K.W.'s Best Interests?

#### A. Standard of Review

■ "The natural right existing between parents and their children is of constitutional dimensions." *In re L.E.S.*, 471 S.W.3d 915, 919 (Tex. App.–Texarkana Aug. 18, 2015, no pet.) (quoting *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985)). "Indeed, parents have a fundamental right to make decisions concerning " 'the care, custody, and control of their children.' " *Id.* (quoting *Troxel v. Granville*, 530 U.S. 57, 65, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000)). "Because the termination of parental rights implicates fundamental interests, a higher standard of proof—clear and convincing evidence—is required at trial." *Id.* (quoting *In re A.B.*, 437 S.W.3d 498, 502 (Tex. 2014)). "This Court is therefore required to 'engage in an exacting review of the entire record to determine if the evidence is ... sufficient to support the termination of parental rights.' " *Id.* at 919–20 (quoting *A.B.*, 437 S.W.3d at 500). " '[I]nvoluntary termination statutes are strictly construed in favor of the parent.' " *Id.* at 920 (quoting *In re S.K.A.*, 236 S.W.3d 875, 900 (Tex. App.–Texarkana 2007, pet. denied) (quoting *Holick*, 685 S.W.2d at 20)).

■ "In order to terminate parental rights, the trial court must find, by clear and convincing evidence, that the parent has engaged in at least one statutory ground for termination and that termination is in the child's best interest." *Id.* (citing *In re E.N.C.*, 384 S.W.3d 796, 798 (Tex. 2012)). "Clear and convincing evidence' is that 'degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of

the allegations sought to be established.' " *Id.* (quoting TEX. FAM. CODE ANN. § 101.007 (West 2014)); *see In re J.O.A.*, 283 S.W.3d 336, 344 (Tex. 2009). "This standard of proof necessarily affects our review of the evidence." *L.E.S.*, 471 S.W.3d at 920.

"There is a strong presumption that keeping a child with a parent is in the child's best interest." *In re J.A.S., Jr.*, No. 13-12-00612-CV, 2013 WL 782692, at *7 (Tex. App.–Corpus Christi Feb. 28, 2013, pet. denied) (mem. op.) (citing *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006) (per curiam)). "Termination 'can never be justified without the most solid and substantial reasons.' " *In re N.L.D.*, 412 S.W.3d 810, 822 (Tex. App.–Texarkana 2013, no pet.) (quoting *Wiley v. Spratlan*, 543 S.W.2d 349, 352 (Tex. 1976)).

In determining the best interests of the child, courts consider the following *Holley* factors:

> (1) the desires of the child, (2) the emotional and physical needs of the child now and in the future, (3) the emotional and physical danger to the child now and in the future, (4) the parental abilities of the individuals seeking custody, (5) the programs available to assist these individuals, (6) the plans for the child by these individuals, (7) the stability of the home, (8) the acts or omissions of the parent that may indicate the existing parent-child relationship is not a proper one, and (9) any excuse for the acts or omissions of the parent.

*Id.* at 818–19 (citing *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976)); *see In re E.N.C.*, 384 S.W.3d 796, 807 (Tex. 2012); *see also* TEX. FAM. CODE ANN. § 263.307(b) (West Supp. 2016). Further, we may consider evidence used to support the grounds for termination of parental rights in the best-interest analysis. *C.H.*, 89 S.W.3d at 28.

"In our review of factual sufficiency, we give due consideration to evidence the trial court could have reasonably found to be clear and convincing." *L.E.S.*, 471 S.W.3d at 920 (citing *In re H.R.M.*, 209 S.W.3d 105, 109 (Tex. 2006) (per curiam)). "We consider only that evidence the fact-finder reasonably could have found to be clear and convincing and determine " 'whether the evidence is such that a fact[-]finder could reasonably form a firm belief or conviction about the truth of the . . . allegations.' " " *Id.* (quoting *H.R.M.*, 209 S.W.3d at 109; *In re C.H.*, 89 S.W.3d 17, 25 (Tex. 2002)); *In re J.F.C.*, 96 S.W.3d 256, 264, 266 (Tex. 2002). "If, in light of the entire record, the disputed evidence that a reasonable fact[-]finder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient." *Id.* (quoting *J.F.C.*, 96 S.W.3d at 266). " '[I]n making this determination,' we must undertake " 'an exacting review of the entire record with a healthy regard for the constitutional interests at stake.' " " *Id.* (quoting *A.B.*, 437 S.W.3d at 503 (quoting *C.H.*, 89 S.W.3d at 26).

"Despite the profound constitutional interests at stake in a proceeding to terminate parental rights, " 'the rights of natural parents are not absolute; protection of the child is paramount.' " *Id.* (quoting *In re A.V.*, 113 S.W.3d 355, 361 (Tex. 2003) (quoting *In re J.W.T.*, 872 S.W.2d 189, 195 (Tex. 1994))); *see In re M.S.*, 115 S.W.3d 534, 547 (Tex. 2003). "A child's emotional and physical interests must not be sacrificed merely to preserve parental rights." *Id.* (quoting *In re C.A.J.*, 459 S.W.3d 175, 179 (Tex. App.–Texarkana 2015, no pet.) (citing *C.H.*, 89 S.W.3d at 26)).

## B. The Evidence at Trial

The evidence at trial demonstrated that the children were not living with their Mother when the Department initially decided to remove them from Father's care. The initial allegations leading to the removal of D.W. and K.W. were examined by Loresha Wilson, an investigator with the Department.[5]

Wilson visited with the children at their school to inquire about the initial allegations. According to Wilson, D.W. said that he "r[a]n out of food sometimes," and K.W. was wearing filthy pants and "had a foul odor of urine." Kathy Cates, a counselor at Gay Avenue Primary School, testified that K.W. arrived at school dirty on numerous occasions and had "very unkept" hair. Cates also testified that K.W. urinated on herself while at school. It was later established that K.W. had a urinary tract infection which was not being properly treated. Wilson testified that she visited Father, that Father had food in the refrigerator, and that the home was small, but appropriate.

After Father had been evicted from his home, Wilson visited him again at a new residence. She noticed that D.W. and K.W. were dirty and did not have shoes, socks, or coats to wear in the cold. Father informed Wilson that their belongings were locked up inside of the residence they were recently evicted from. According to Wilson, Father tested positive for amphetamines, but claimed it was because the people who he was staying with were using drugs in the home. Father later told Wilson that he had no resources to care for the children, who he believed "needed to go to foster care." Wilson testified that the children were then placed in an emergency shelter.

CPS caseworker, Alma Gaviria, located Mother on November 18, 2015, and set up a family service plan for her.[6] Gaviria confirmed that Mother had employment and testified that Mother engaged in individual counseling with Dawn McClain, participated in a psychological evaluation, and completed parenting education. Gaviria testified that part of Mother's family service plan required her to provide appropriate housing. Gaviria visited Mother in her clean, two-bedroom apartment, which had working utilities, and labeled the housing as appropriate. Because it initially appeared that Mother was doing well in working through the family service plan, she was given bi-weekly, two-hour, supervised visitation with the children. According to Gaviria, Mother's visitations with K.W. and D.W. went well. Gaviria testified, "[Mother] would show up, she would bring her other two kids, sometimes she would bring snacks for them .... she would come to the visitation and interact with them." However, Gaviria testified that Mother eventually decided not to complete the family service plan.

When McClain determined that she would no longer see Mother because "she

---

**5.** Wilson testified that at the time of the removal, "[Father] insisted that the mother had lost her parental rights to their children ... [a]nd ... he insisted that he had full custody of the children." Wilson testified that she was never able to locate the Mother. Although Wilson was aware of a case in Upshur County regarding the parent-child relationship between the children and Mother, Wilson claimed she was not aware of the details of the case. The judgment from the prior SAPCR proceeding in Upshur County was introduced into evidence. It showed that Mother's parental rights to D.W. and K.W. were not terminated, but that she had no independent possessory rights over the children, although she would be allowed to visit them if Father determined it was in the children's best interests.

**6.** The return of service filed with the trial court indicated that Mother was served in this case on March 13, 2015.

was still lacking parenting skills," Gaviria testified that she asked another counselor to work with Mother, but that Mother did not enroll in those services with the other counselor. Although Gaviria had initially determined Mother's apartment to be an appropriate home, Gaviria was later denied entry to the residence due to an alleged bed bug infestation. After speaking with the employees of the apartment complex, Gaviria discovered that Mother was not a tenant of the apartment complex and had been asked to leave several times.[7] Gaviria then said that Mother began missing visitations with K.W. and D.W., that her last visit with them was on May 11, 2016, and that Mother had not seen the children for three and one-half months.

According to Gaviria, the children were very upset over their Mother's missed visitation with them. As of the time of trial, Gaviria did not know where Mother was living. Although Gaviria testified that she spoke with Mother on the Thursday before trial, Mother did not appear on the day of trial. The Department recommended that Mother's parental rights be terminated.

Gaviria told the court that the children were doing well in foster care and had been there for over a year. Nikki Blakely, D.W. and K.W.'s foster mother, testified that the children had resided with her for fourteen months. D.W. initially had violent tendencies, was irritated and anxious, and was not sleeping. After receiving medical treatment, D.W. was prescribed medication to alleviate his anxiety and help him sleep. He was also being treated for reactive attachment disorder and defiant disorder, but was making progress. Blakely testified that K.W. also initially experienced behavioral issues and would become upset if the family tried to correct her behavior.

Blakely said that K.W. was doing well in school and that D.W. was struggling in math, but was receiving tutoring through the Boys and Girls Club. She testified that the children were clean, healthy, and received medical treatment whenever necessary. According to Blakely, both children were doing better and had settled into a good routine. Blakely testified that the children relied on her and her husband, but that she and her husband did not have plans to adopt the children. Blakely hoped that the children would be adopted by someone else.

Thomas Brown, the guardian ad litem for the children, testified that the children were thriving in the Blakely home. Brown testified that although the children wanted to return to Mother, doing so would have an extremely detrimental affect on them. According to Blakely, K.W. "exhibited and had outcries about going back to her mother." Blakely further explained, "[S]he wants to see her mom and wants to be with her mom, but then we revert back to nightmares and fears of food hoarding."

## C. Analysis of the *Holley Factors*

D.W. is ten years old and K.W. is seven years old. According to Brown and Blakely, both children expressed a desire to return to Mother. Accordingly, the first *Holley* factor weighs against a finding of termination of Mother's parental rights.

According to Blakely, D.W. had been diagnosed with reactive attachment disorder and defiant disorder and was receiving medication for anxiety. He was also struggling in mathematics and was receiving tutoring. Blakely testified that K.W. also experienced emotional instability, became upset when her behavior was corrected,

---

7. Tommy Ferguson, the assistant manager of Pecanwood Apartments, testified that he knew Mother, that Mother's mother-in-law was a tenant in the apartment complex, and that Mother had never lived there.

and hoarded food. Blakely testified that she was still working to resolve these issues, indicating that D.W. and K.W.'s emotional needs would continue into the foreseeable future. Yet, the record suggested that Mother had not taken care of the children's emotional needs in the past and might not do so in the future. The trial court heard that Mother had previously been denied possessory rights to the children, and Gaviria explained that their Mother's decision to avoid visiting D.W. and K.W. after May 11, 2016, had taken an emotional toll on the children. From the evidence presented, the trial court could have concluded that Mother's intermittent involvement with D.W. and K.W. over the last several years posed an emotional danger to the children. Thus, the second and third *Holley* factors weigh in favor of termination of Mother's parental rights.

As for the next two *Holley* factors, the evidence showed that McClain told the Department that Mother lacked parenting skills to the degree that McClain decided to discharge her. McClain explained to Gaviria that Mother "didn't learn anything from her." When Gaviria secured another counselor to assist Mother with parenting skills, Mother failed to take advantage of that opportunity. Although Mother initially took steps toward completing the family service plan, she was unable to complete it. The fourth and fifth *Holley* factors weigh in favor of termination of Mother's parental rights.

Because Mother was not present at trial, there was no evidence of her plans for the children. Gaviria's testimony established that Mother represented that she was renting a two-bedroom apartment, but that those representations were false. Gaviria was unable to determine where Mother was living at the time of trial, and it was not clear whether Mother could provide a stable home for her children. The Department's plans were to allow the children to remain in Blakely's stable home until they could be adopted. We find that the seventh and eighth *Holley* factors weigh in favor of termination of Mother's parental rights.

As for the last two factors, the trial court was aware that as of March 15, 2012, Mother had no possessory rights to the children unless Father determined visitation was in the children's best interests. There was no evidence at trial as to whether Mother visited the children while they were in Father's care. Mother's absence in the children's lives, her failure to complete her family service plan, and the voluntary relinquishment of her rights to visit the children after May 11, 2016, indicated that the parent-child relationship was not an appropriate one. While Gaviria testified that Mother made excuses and indicated that she had previously forgotten visitation dates, Gaviria had explained the importance of following the family service plan and attempted to work with Mother, unsuccessfully. We find that the last two *Holley* factors also weigh in favor of termination of Mother's parental rights.

Based on this evidence presented at trial, and an examination of the *Holley* factors, we conclude that the trial court could have reasonably formed a firm belief or conviction that termination of Mother's parental rights to D.W. and K.W. was in their best interests. Therefore, we find there is factually sufficient evidence to support the trial court's best-interest finding, and we overrule Mother's point of error.

## VI. Conclusion

In light of the foregoing, we affirm the trial court's judgment terminating both Father's and Mother's parental rights to D.W. and K.W.