

# In the
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

No. 06-25-00081-CV

IN THE INTEREST OF C.B., D.N.B., AND J.B., CHILDREN

On Appeal from the County Court at Law
Panola County, Texas
Trial Court No. 2024-180

Before Stevens, C.J., van Cleef and Rambin, JJ.
Memorandum Opinion by Justice Rambin

# MEMORANDUM OPINION

The Texas Department of Family and Protective Services brought suit against Susan Bell, Appellant, for the protection of Charlie, Dalton, and Jarod, her children.[1]  The Department also initially sued Charlie and Dalton's father, Mark.  While it initially alleged that Jarod's father was unknown, the Department later amended its petition stating that Jack was Jarod's alleged father.  At the final hearing, the trial court issued a final order based on the parties' agreement, naming Mark as the managing conservator of Charlie and Dalton and the non-parent managing conservator of Jarod.  The final order found that Jarod's father is Jack but did not award Jack conservatorship.  The final order named Susan as a conservator of all three children and gave her phased-in visitation with Dalton and Jarod,[2] beginning with supervised visitation and stepping up to standard possession after she met certain requirements.

In two issues, Susan claims that (1) the trial court erred in denying her motion for new trial because she involuntarily signed the agreed final order, and (2) the agreed final order is void because there was a court of continuing, exclusive jurisdiction for matters regarding Jarod.  The Department concedes that the trial court did not have jurisdiction over Jarod and acknowledges that the final order should be vacated as to him.  We reorder Susan's issues to first address jurisdiction.

Because we conclude that the trial court (1) did not have jurisdiction to enter the final order with respect to Jarod and (2) did not abuse its discretion in denying Susan's motion for

---

[1]We use pseudonyms to protect the identities of the children.  *See* TEX. R. APP. P. 9.8(b), 9.8 cmt.

[2]Charlie turned eighteen years old within four and a half months of the signing of the final order.  The final order provided that Susan and Charlie could visit based on mutual agreement.

new trial, we vacate the trial court's final order as it relates to Jarod and affirm it with respect to Charlie and Dalton.

## I.    The Trial Court Did Not Have Jurisdiction to Enter a Final Order as to Jarod

In her second issue, Susan argues that the trial court never gained subject matter jurisdiction over this matter as it related to Jarod, thus the final order is void and should be vacated.    While Susan's issue is overstated because, as discussed below, the trial court had jurisdiction to enter emergency and temporary orders, the Department concedes that the trial court did not have jurisdiction to enter final orders as to Jarod, and we agree.

### A.    Applicable Law

"On rendition of [a] final order determining parentage, [a court] 'acquire[s] continuing, exclusive jurisdiction over the matters . . . in connection with [the] child.'"  *In re J.I.M.*, 516 S.W.3d 674, 674 (Tex. App.—Texarkana 2017, no pet.) (quoting TEX. FAM. CODE ANN. § 155.001(a) (citing TEX. FAM. CODE ANN. § 155.001(b)(2))).  "Once a Texas court has acquired continuing, exclusive jurisdiction under Section 155.001, 'no other court of this state has jurisdiction of a suit with regard to that child except as provided by [Chapter 155], Section 103.001(b), or Chapter 262.'"  *Id.* at 674–75 (alteration in original) (quoting TEX. FAM. CODE ANN. § 155.001(c)); *see In re D.W.*, 533 S.W.3d 460, 463 (Tex. App.—Texarkana 2017, pet. denied).

> The family code requires that the petitioner or the trial court [in a suit affecting the parent-child relationship] request from the bureau of vital statistics identification of the court that last had continuing, exclusive jurisdiction of the child in a suit, unless the petition alleges that no court has continuing, exclusive jurisdiction of the child and the issue is not disputed by the pleadings.

*S.C. v. Tex. Dept. of Family & Protective Servs.*, No. 03-12-00518-CV, 2013 WL 150290, at *2 (Tex. App.—Austin Jan. 10, 2013, pet. denied) (mem. op.) (citing TEX. FAM. CODE ANN. § 155.101(a)(1)).

"Under Chapter 262, the Department may, under certain circumstances, take emergency possession of [a child] without prior notice and a hearing." *In re D.W.*, 533 S.W.3d at 464 (citing TEX. FAM. CODE ANN. § 262.001); *In re J.I.M.*, 516 S.W.3d at 675 (citing TEX. FAM. CODE ANN. § 262.001). "Even though a different court may have continuing, exclusive jurisdiction under Chapter 155, a suit brought by a governmental entity requesting an order under Chapter 262 'may be filed in a court with jurisdiction to hear the suit in the county in which the child is found.'" *In re D.W.*, 533 S.W.3d at 464 (quoting TEX. FAM. CODE ANN. § 262.002).

This Court further stated in *In re D.W.*,

> When the Department files a suit under Chapter 262 in "a court with jurisdiction to hear the suit in the county in which the child is found," and the Chapter 262 court is not the court of continuing, exclusive jurisdiction under Chapter 155, the Chapter 262 court may enter emergency orders, hold a full adversary hearing, and enter temporary orders.

*Id.* at 465 (quoting TEX. FAM. CODE ANN. § 262.002 (citing TEX. FAM. CODE ANN. §§ 262.102, 262.202)). "However, once the Chapter 262 court issues a temporary order after a full adversary hearing, then the Department "***shall*** request identification of a court of continuing, exclusive jurisdiction as provided by Chapter 155." *Id.* (quoting TEX. FAM. CODE ANN. § 262.202). "And if the Chapter 262 court determines the identity of a court of continuing, exclusive jurisdiction in response to that request, then under Section 262.203, the Chapter 262 court ***shall***, . . . 'transfer [the termination proceeding] to the court of continuing, exclusive jurisdiction,'" "order transfer

4

of the suit from that court of continuing, exclusive jurisdiction;" or, if improper venue is at issue, order transfer of the matter to the court with venue under Chapter 103. *Id.* at 465–66 (quoting TEX. FAM. CODE ANN. § 262.203(a)). If the matter is transferred to the Chapter 262 court, then upon transfer of the matter from the court of continuing, exclusive jurisdiction, the Chapter 262 court shall proceed to hear the remainder of the suit. *See In re E.B.*, No. 06-23-00083-CV, 2024 WL 1125096, at *1–2 (Tex. App.—Texarkana Mar. 15, 2024, no pet.) (mem. op.).

## B.      Jurisdictional Facts

In 2015, the 211th Judicial District Court of Denton County, Texas (the Denton County Court), in cause number 14-08863-211, entered a default order establishing the parent-child relationship between Jack and Jarod.[3]  The Denton County Court thus became the court of continuing, exclusive jurisdiction over matters in connection with Jarod. *See In re J.I.M.*, 516 S.W.3d at 674; TEX. FAM. CODE ANN. § 155.001(a) (Supp.).

On June 13, 2024, the Department filed a petition in the County Court at Law for Panola County, Texas (the Panola County Court), which sought conservatorship of all three children under Chapter 262; termination of Susan's parental rights to all three children; termination of Mark's parental rights to Charlie and Dalton; and termination of the unknown father's (Jack's) parental rights to Jarod.  The Department alleged in its original petition that "[The Panola County] Court has jurisdiction of the suit . . . under Chapter 262, . . . and Petitioner believes no other [c]ourt has continuing, exclusive jurisdiction over the children."  The Department represented that it would, "[i]n accordance with § 155.101(a), . . . request that the Vital Statistics

---

[3]The Denton County Court also entered a modification order in 2017.

5

Unit identify the court that last had continuing, exclusive jurisdiction, or confirm that the children have not been the subjects of a suit resulting in a court of continuing jurisdiction." The affidavit of removal attached to the original petition indicated that all three children had resided in Panola County for at least the preceding six months.

On July 11, 2024, the Department filed its first amended petition. The Department removed the language stating that it believed the Panola County Court had continuing, exclusive jurisdiction and instead alleged only that "[the Panola County] [C]ourt has jurisdiction of this suit." The Department also removed the language stating that it would request information regarding any court of continuing, exclusive jurisdiction from the Vital Statistics Unit. The first amended petition states that Jack is Jarod's alleged father.

Susan filed a general denial.

Twice during the pendency of the proceeding, the Department requested jurisdictional information from the Vital Statistics Unit on any court of continuing, exclusive jurisdiction regarding Jarod, but each time, the information the Department supplied to the Unit about Jarod was incorrect. On one occasion, Jarod's birthplace was given as Alaska rather than Arkansas, and on the second occasion, his birth year was given as 2024 rather than 2014. Correspondence from the Unit stating that Jarod "ha[d] not been the subject of a suit affecting the parent-child relationship," but showing an incorrect birth year for Jarod, was filed with the trial court on May 20, 2025.[4] Because the Department misidentified Jarod, neither of those requests was a

---

[4]In addition, on August 4, 2025, the Department filed a paternity registry inquiry request dated June 17, 2024, seeking information regarding Jarod's father, but the request form shows Jarod's birth state as Alaska. Also on August 4, 2025, the Department filed a certificate of paternity registry search dated February 20, 2025, reporting

6

proper request for identification of a court of continuing, exclusive jurisdiction as to Jarod. *See* TEX. FAM. CODE ANN. § 155.101(a) (Supp.).

At the hearing on the final order, the trial court was made aware of the possibility of the existence of a court of continuing, exclusive jurisdiction. Susan's counsel stated that "[they] believe either out of Arkansas or out of Denton County, Texas, a . . . court of continuing jurisdiction . . . has in place a child support order already." Susan's counsel requested the trial court to issue a temporary order redirecting Jack's child support from Susan to Mark so that "then the appropriate paperwork to make that official will be done through the [c]ourts of continuing jurisdiction." Counsel for Jack stated his agreement.

Nonetheless, the trial court signed the final order on the date of the hearing, August 13, 2025. The trial court implicitly recognized the existence of another court with jurisdiction over Jarod when it ordered that "the current child support order that . . . [Jack] is obligated to pay . . . shall be redirected to be paid to [Mark]."

On October 7, 2025, the Department filed a motion with the Denton County Court to transfer the matter to the Panola County Court. On October 8, 2025, the Denton County Court issued an order transferring the matter to the Panola County Court.

## C.    Analysis

As the court of continuing, exclusive jurisdiction, "absent an otherwise valid transfer," only the Denton County Court had jurisdiction to issue final orders in a matter involving Jarod. *See In re E.B.*, 2024 WL 1125096, at *1. Even though the Panola County Court had jurisdiction

---

"that a diligent search of the paternity registry has been made and no notice of intent to claim paternity has been located concerning" Jarod, showing a correct birth year and birth state.

under Section 262.001 of the Texas Family Code to enter emergency orders and temporary orders with respect to Jarod, the Denton County Court remained the court of continuing, exclusive jurisdiction. Absent a valid transfer from the Denton County Court, the Panola County Court was not permitted to enter a final order as to Jarod. *See id.*

We have previously held that "the continuing, exclusive jurisdiction statutory scheme is 'truly jurisdictional'—that is, when one court has continuing and exclusive jurisdiction over a matter, any order or judgment issued by another court pertaining to the same matter is void." *In re L.S.*, 557 S.W.3d 736, 740 (Tex. App.—Texarkana 2018, no pet.) (quoting *In re C.G.*, 495 S.W.3d 40, 44–45 (Tex. App.—Corpus Christi–Edinburg 2016, pet. denied)). Because the Panola County Court did not have jurisdiction to enter the final judgment as to matters concerning Jarod at the time it entered its final order, the final order is void as to Jarod. *See Ins. Co. of Penn. v. Martinez*, 18 S.W.3d 844, 847 (Tex. App.—El Paso 2000, no pet.) (recognizing an "appellate court has no jurisdiction to consider the merits of an appeal from a void judgment").

In light of the foregoing, we vacate the trial court's final order as to Jarod.[5]

## II.   The Trial Court Did Not Abuse Its Discretion in Denying Susan's Motion for New Trial

In her first issue, Susan claims that she involuntarily entered into the agreed final order due to "fraud, duress, and coercion," and thus her motion for new trial claiming the order was invalid was improperly denied.

---

[5]We express no opinion as to the validity of the order transferring the case from the Denton County Court to the Panola County Court.

**A.     Background**

The Department filed its suit for the protection of the children in June 2024 with the Panola County Court. The Department was awarded temporary managing conservatorship of the children, and Susan was ordered to begin working services. As the one-year dismissal date approached, Susan requested a jury trial, the trial court extended the dismissal date to December 2025, and the trial court set the matter for trial on August 18, 2025.

On August 13, 2025, the parties gathered for the purpose of recording the children's testimony for use at trial. During that time, the parties reached an agreement, a subsequent hearing was held that same day, and the trial court entered a final order. Susan indicated, on the record, that the final order reflected her agreement.

The final order "relieved [Susan's appointed counsel] of all duties based on a finding of good cause."

Susan filed a twelve-page pro se "short-form omnibus" motion attacking every phase of the proceedings. By her motion, Susan claimed, among other things, that she involuntarily signed the final order due to coercion and duress, and that the presentation of the coerced final order as an agreed order constituted fraud on the court. The trial court held a hearing on October 15, 2025, on Susan's motion for new trial, in which it took testimony from Susan; her appointed counsel; appointed counsel for Mark; and the children's appointed ad litem, all of whom were present for the August 13 meeting and subsequent hearing.

Prior to the hearing, the trial court took judicial notice of the facts that the parties announced settlement to the trial court on August 13, 2025, at which time Susan agreed to the settlement and signed the final order, "which reduced the settlement to writing."

Susan testified, at the hearing, that her appointed counsel brought a proposed final order to the August 13 meeting at which the children's testimony was to be recorded. She stated that the attorneys discussed custody, support, and visitation, and afterwards, her counsel told her she should take the deal. Susan said she ultimately told her counsel no and left the room. At that point, Susan said the children's ad litem grabbed her and pulled her into a different office, and her counsel joined them. According to Susan, the ad litem yelled and screamed at her and refused to let her leave the room by first holding the door shut and then putting her whole body against the door. Susan said that she did not agree to the deal until her appointed counsel "said that [she] could see the boys after signing."

On cross-examination, Susan admitted that thirty minutes or an hour had passed before the discussion about the agreement in the office and when she appeared before the trial court. Susan admitted that she stood before the trial court and said that it was her agreement. Susan said she told the trial court that it was her agreement, even though it was not, "[b]ecause those people [we]re in control of [her] children, and if [she] didn't, then [she] might never see them again."

Mark testified that he did not see the ad litem or Susan's appointed counsel restrain Susan or coerce her into signing anything.

The children's ad litem testified that on the morning of the meeting, Susan had an opportunity to speak with her appointed counsel about coming to an agreement but that was not successful. The ad litem testified that Susan was "getting loud at that point," and she did not want the children, who were in an office right across the hall, to hear their mother "behaving loudly in the hall" or to hear inappropriate discussions. The ad litem testified that she, Susan, and Susan's appointed counsel went into an office, but the ad litem testified that she never laid a hand on Susan—"I never grabbed her, I never touched her, I never forced her to go into that room." The ad litem testified that the conversation in the office was "very emotional," and she and Susan were yelling at each other. The ad litem said that Susan eventually "scribbled her name on" the proposed order and "threw it at" her appointed counsel. The ad litem testified that Susan's appointed counsel "immediately said, no, I don't want this," and the ad litem said, "[W]e will not be entering that order, it was not signed voluntarily."

The ad litem stated that Susan later came out of the office, and Susan's appointed counsel continued negotiating settlement on her behalf. Sometime later, an agreement was reached, and Susan signed the order. The parties then appeared in the courtroom, where Susan stated she entered into the agreement. The ad litem stated that Susan "was never at any point locked in any room or unable to leave any facility. And [they] certainly did not accept the agreement that [Susan] signed in the heat of the moment in that discussion. The agreement that was entered with this [c]ourt was entered much later." The trial court questioned whether "at any point was anything said that sounded like [Susan's] signature on the agreement was required before she would get to see the children?" The ad litem responded, "Absolutely not."

11

Susan's appointed counsel testified that it was his idea to attempt settlement on the morning that the children's testimony was to be recorded. But he discussed settlement with Susan, and she decided not to accept the deal. He and Susan stepped into the hall. He did not recall that Susan was being loud or inappropriate. The ad litem invited him and Susan to step into a room to discuss settlement. Susan's counsel said that he recalled the door was only partially shut, and the ad litem raised her voice at Susan but did not yell. He recalled that after some discussion, Susan scribbled her name on the proposed order and gave it to him "in an aggressive manner." He told Susan that they could not accept it because it was not voluntary due to her state of mind. But they continued to talk, Susan calmed down, and eventually they reached an agreement. The parties then had to wait almost an hour for the court reporter to arrive.

Susan's counsel testified that the agreement Susan signed that day was essentially the same agreement she had authorized at mediation (but the Department had rejected) and the same agreement that she authorized him to agree to the day before. He said that the terms were actually better in that agreement than what she had previously authorized. They appeared before the trial court. Susan "put[] a new signature on a new agreement" and then testified that that was her agreement.

Susan cross-examined her counsel by asking whether he "at any point [told her] that th[e] order would say that [she] presented a danger to the children." He responded, "[W]e talked about the order, and we talked about the provisions in it. So I would assume yes." He further

12

stated, [W]e talked about the entire order." Susan's counsel agreed that he told her that the trial court would determine visitation and there was "a chance that it would be extremely limited."

After hearing testimony, the trial court orally denied Susan's motion for new trial.[6]

## B.      Standard of Review

We review a trial court's ruling on a motion for new trial in a parental rights termination case for an abuse of discretion. *In re R.R.*, 209 S.W.3d 112, 114 (Tex. 2006) (per curiam); *In re C.D.*, No. 12-21-00045-CV, 2021 WL 4202722, at *3 (Tex. App.—Tyler Sept. 15, 2021, pet. denied) (mem. op.); *In re A.H.J.*, No. 05-15-00501-CV, 2015 WL 5866256, at *5 (Tex. App.— Dallas Oct. 8, 2015, pet. denied) (mem. op.); *In re C.J.O.*, 325 S.W.3d 261, 267 (Tex. App.— Eastland 2010, pet. denied); *see In re O.R.F.*, 417 S.W.3d 24, 41 (Tex. App.—Texarkana 2013, pet. denied) ("We review a trial court's ruling on a motion for new trial based on newly discovered evidence for an abuse of discretion."). "A trial court abuses its discretion when it acts arbitrarily or unreasonably, without reference to guiding rules or principles." *Iliff v. Iliff*, 339 S.W.3d 74, 78 (Tex. 2011). "A trial court also abuses its discretion by failing to analyze or apply the law correctly." *Id.*

Under an abuse of discretion standard, "we defer to the trial court's factual findings if they are supported by the evidence, but we review legal determinations de novo." *State v. Loe*, 692 S.W.3d 215, 226 (Tex. 2024) (citing *Haedge v. Cent. Tex. Cattlemen's Ass'n*, 603 S.W.3d 824, 827 (Tex. 2020) (per curiam)). "At a hearing on a motion for new trial, the trial court is the trier of fact and the sole judge of the witnesses' credibility." *Holland v. Lovelace*, 352 S.W.3d

---

[6]The motion was later denied by operation of law. *See* TEX. R. CIV. P. 329b(c).

777, 783 (Tex. App.—Dallas 2011, pet. denied). "As a result, '[w]e defer to the trial court's determinations on credibility when considering evidence concerning a motion for new trial.'" *Id.* (alteration in original) (quoting *In re T.R.D.*, No. 03-09-00150-CV, 2010 WL 2428426, at *2 (Tex. App.—Austin, June 18, 2010, no pet.) (mem. op.).

## C.     Analysis

We begin by noting that the hearing before the trial court focused on factual testimony. Indeed, at the hearing, neither Susan nor the Department cited any statutes or cases regarding what legal ruler the trial court should use to measure the evidence being presented. Susan's motion asserted "fraud on the court" citing *Montgomery v. Kennedy*, 669 S.W.2d 309, 312–13 (Tex. 1984) and *King Ranch, Inc. v. Chapman*, 118 S.W.3d 742, 751 (Tex. 2003). But those are bill of review cases.[7] Here, Susan brought a motion for new trial, which presents a different context than bill of review.[8] Further, neither *Montgomery* nor *King Ranch, Inc.*, involved parental rights.[9] Consequently, the trial court's hearing proceeded on Susan's assertion in her

---

[7]*See Montgomery*, 669 S.W.3d at 310 ("Virginia Lou Wilkinson Montgomery and her children sued . . . in a bill of review to set aside a prior agreed judgment."); *King Ranch, Inc.*, 118 S.W.3d at 751 ("The grounds upon which a bill of review can be obtained are narrow because the procedure conflicts with the fundamental policy that judgments must become final at some point.").

[8]The Texas Supreme Court stated,

> A bill of review is an equitable proceeding brought by a party seeking to set aside a prior judgment that is no longer subject to challenge by a motion for new trial or appeal. . . . Bill of review plaintiffs must ordinarily plead and prove (1) a meritorious defense to the underlying cause of action, (2) which the plaintiffs were prevented from making by the fraud, accident or wrongful act of the opposing party or official mistake, (3) unmixed with any fault or negligence on their own part.

*Caldwell v. Barnes*, 154 S.W.3d 93, 96 (Tex. 2004) (per curiam) (citation omitted).

[9]*Montgomery*, 669 S.W.3d at 310; *King Ranch, Inc.*, 118 S.W.3d at 751.

14

motion that she had been "coerced" into signing the agreed judgment, without either side providing the trial court guidance on what "coerced" meant in the context of this case.

On appeal, Susan asserts that the trial court abused its discretion by denying her new trial motion. Susan does not assert, however, that the trial court made an error of law by using an incorrect legal test when deciding the motion.[10] Instead, Susan contends the trial court saw evidence when there was nothing to be seen.

There is a developed body of caselaw regarding parents who, after signing affidavits relinquishing their parental rights, later attempt to undo the termination of those rights on grounds that they did not fully understand what they were signing, or if they did, their signatures were involuntary. *See In re D.S.*, 602 S.W.3d 504, 509 (Tex. 2020) (citing *In re K.S.L.*, 538 S.W.3d 107, 108–09 (Tex. 2017) ("Texas has a compelling interest in resolving termination suits economically, efficiently, and with finality. By enacting [Texas Family Code] [S]ection 161.211(c), our Legislature made a clear policy choice: when parents choose to relinquish their parental rights in accordance with the 'exacting' and 'detailed' statutory requirements for doing so, a collateral attack is limited to specific grounds relating to whether the relinquishment was knowing and voluntary." (Footnote omitted) (citation omitted))). That body of law is not an exact match to the present circumstances, because it involves the specific requirements for such affidavits. *See id.*[11] However, that body of law is useful, because it deals with what is "knowing" and "voluntary" in the context of a parent signing a document impacting the parent-

---

[10]Susan cites cases which she contends should guide *this* Court's determination of the proper legal test. But she does not identify the legal test purportedly used by the trial court and then undertake to demonstrate error in that test.

[11]*See also* TEX. FAM. CODE ANN. §§ 161.103, .106.

15

child relationship.  *See id.*  Further, that body of caselaw is not limited to collateral attacks.[12]  Further still, the statutory terms "fraud, duress, or coercion" of Section 161.211(c) were not given statutory definitions specific to affidavits of relinquishment or waiver, so courts apply the plain meaning of those terms.  *See In re J.H.*, 486 S.W.3d 190, 195–96 (Tex. App.—Dallas 2016, no pet.).  Using those plain meanings, testimony that a parent misunderstood a document does not rise to the level of the document being affirmatively and fraudulently misrepresented to her.  *Id.* at 195 ("At most, [the mother] testified that she did not understand the proceedings that took place the day of the termination hearing.  That testimony, however, does not reflect fraud.").  As our sister court in Tyler has recognized, the angst, pressure, and emotional turmoil often associated with proceedings regarding parental rights does not, without more, constitute duress or coercion.  *See In re C.D.*, No. 12-21-00045-CV, 2021 WL 4202722, at *4 (Tex. App.—Tyler Sept. 15, 2021, pet. denied) (mem. op.) ("Courts have determined in cases involving voluntary affidavits of relinquishment that a parent's feeling pressured, emotionally upset, or under stress when signing the affidavit did not render the affidavit involuntary. . . . In other words, that a parent feels pressured, emotionally upset, and under stress when signing an affidavit of relinquishment does not render the affidavit involuntary or rise to the level of duress or coercion." (Citation omitted)) (collecting cases).

We turn, then, to Susan's claims of fraud, duress, and coercion by various means.  Susan's claims are supported by her testimony at the hearing on the motion for new trial.  Susan

---

[12]*See* TEX. FAM. CODE ANN. § 161.211(c) ("A *direct* or collateral attack on an order terminating parental rights based on an unrevoked affidavit of relinquishment of parental rights or affidavit of waiver of interest in a child is limited to issues relating to fraud, duress, or coercion in the execution of the affidavit." (Emphasis added)).

testified that she was not aware of the "danger" finding in the agreed order and that she was not told about it. But she did not testify that it was affirmatively misrepresented to her. The trial court was not required to accept Susan's view of events. The ad litem and Susan's appointed counsel both denied that the ad litem used any physical force on Susan or forced her to stay in a closed room to discuss settlement. The ad litem and Susan's appointed counsel also both testified as to any purported threats that Susan would never get to see her children if she did not sign the agreement: the ad litem responded to the trial court's question about whether such a threat was made with "[a]bsolutely not." Susan could well have perceived pressure in attorney advice that an agreement is a better option because trial could result in limited visitation. But Susan's appointed counsel testified that he offered that advice as his professional opinion, and the ad litem testified that, in her opinion, the children did not want to testify at pre-trial depositions, so it would be preferable to avoid trial. It was the trial court's role, as fact-finder, to sort through all of the facts, including Susan's original testimony that the agreement was, at the time it was entered, her agreement.[13]

On these facts, and bearing in mind the trial court's role as "the sole judge of the witnesses' credibility," we find no abuse of discretion in the trial court's denial of the motion for new trial. *See Holland*, 352 S.W.3d at 783.

---

[13]Susan's appointed counsel asked, "So [Susan], you heard me recite in the terms and the agreement in this case. And though we're not, we're not real happy about it, do you understand that that's where we are today. But is this your agreement?" Susan responded, "Yes."

17

## III. Conclusion

We affirm the trial court's final order as it relates to Charlie and Dalton and vacate the

final order as it relates to Jarod.[14]

Jeff Rambin
Justice

Date Submitted:     January 12, 2026
Date Decided:      March 30, 2026

---

[14]After Susan filed her appellate brief, we granted her appointed appellate counsel's motion to withdraw, which was filed on the basis that Susan and counsel had differing opinions on the necessity of supplemental filings. Counsel disagreed about the necessity of supplemental filings, and Susan was unable to file supplements pro se due to the prohibition of hybrid representation. Since her counsel withdrew, Susan has filed several pro se motions. First, she filed a motion requesting that we (1) consider additional evidence already in the clerk's record but not cited in her opening brief, (2) compel completion of the reporter's record with transcripts of unspecified hearings that were recorded but not transcribed, and (3) abate the appeal if necessary; a second motion to correct an error in the first motion; and a third, "renewed" motion to abate the appeal and compel completion of the reporter's record.

Although this is a Chapter 262 proceeding, neither of Susan's issues on appeal concerns the sufficiency of the evidence against her, and her parental rights were not terminated. Susan has not raised an issue regarding ineffective assistance of counsel nor one complaining of any specific finding in the final order. Susan's post-submission motions do not discuss how the requested additional evidence or the unspecified reporter's records relate to the issues of jurisdiction and fraud/coercion/duress that were raised.

To the extent that Susan's motions raise arguments not presented in her opening brief, they are not timely, and we will not now consider them. *See* TEX. R. APP. P. 38.6(c) (stating that any reply brief "must be filed within [twenty] days after the date the appellee's brief was filed); *Fin & Feather Club v. Leander*, 415 S.W.3d 548, 558 n.23 (citing TEX. R. APP. P. 38.3) (declining to address issue raised for the first time in a reply brief). To the extent that Susan's motions request us to consider evidence or the trial court record not referenced in her opening brief nor brought to this Court's attention prior to the submission of this matter, we find that our rulings on the issues Susan raised make consideration of additional evidence and supplementation of the reporter's record unnecessary. *See* TEX. R. APP. P. 38.7 ("A brief may be amended or supplemented whenever justice requires, on whatever reasonable terms the court may prescribe.").

We overrule all of Susan's post-submission motions.

18