

# NUMBER 13-23-00433-CV

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI – EDINBURG

## IN THE INTEREST OF A.V., A CHILD

### On appeal from the County Court at Law No. 5
### of Nueces County, Texas.



# NUMBER 13-23-00457-CV

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI – EDINBURG

## IN RE C.C.

## On Petition for Writ of Mandamus

## MEMORANDUM OPINION

**Before Justices Benavides, Longoria, and Tijerina**
**Memorandum Opinion by Justice Benavides[1]**

Appellant and relator C.C. (Chloe)[2] filed a notice of appeal and a petition for writ

---

[1] *See* TEX. R. APP. P. 52.8(d) ("When denying relief, the court may hand down an opinion but is not required to do so. When granting relief, the court must hand down an opinion as in any other case."); *id.* R. 47.4 (distinguishing opinions and memorandum opinions).

[2] On our own motion, we identify the child and his caregivers by aliases. *See* TEX. FAM. CODE ANN. § 109.002(d); TEX. R. APP. P. 9.8.

of mandamus pro se,[3] seeking relief from the trial court's[4] final order designating a nonparent, J.S. (Janice), as her son, A.V.'s (Alvin), managing conservator. By four multifarious issues that we have reordered, Chloe contends that the trial court abused its discretion by: (1) signing a final order without having continuing, exclusive jurisdiction; (2) granting conservatorship to a third party who did not have standing; (3) finding that the fit-parent presumption had been rebutted; and (4) granting conservatorship to a third party. We conditionally grant the petition for writ of mandamus in part and deny it in part, and we dismiss the appeal as moot.

## I.   PROCEDURAL HISTORY

On November 12, 2020, appellee and real party in interest the Department of Family and Protective Services (the Department) filed an original petition seeking to terminate Chloe's parental rights.[5] In its petition, the Department stated that it believed "no other Court has continuing, exclusive jurisdiction over the child," but that "[i]n accordance with § 155.101(a), Texas Family Code, the Department will request that the Vital Statistics Unit identify the court that last had continuing, exclusive jurisdiction, or confirm that the child has not been the subject of a suit resulting in a court of continuing jurisdiction."

On April 20, 2021, the trial court signed temporary orders placing Alvin with Janice,

---

[3] We abated this case for the trial court to determine whether Chloe was entitled to counsel and whether she desired counsel. The trial court determined that Chloe was not entitled to counsel, and none was appointed. The trial court's finding and its decision to not appoint counsel have not been challenged.

[4] The original proceeding arises from trial court cause number 2020-FAM-61543-5 in County Court at Law No. 5 of Nueces County, Texas, and the respondent is the Honorable Timothy McCoy. *See* TEX. R. APP. P. 52.2.

[5] The petition also sought to terminate the parental rights of Alvin's father, J.J.V. (Jason). Jason is not a party to this appeal or mandamus proceeding.

3

a family friend, and permitting Chloe weekend visitation. Further temporary orders were issued throughout the case as deemed appropriate by the trial court.

On April 6, 2023, the trial court signed a final order appointing Chloe and Janice as joint managing conservators of Alvin, and appointing Jason as Alvin's possessory conservator. The order granted Chloe a standard possession schedule. *See* TEX. FAM. CODE ANN. § 153.312. On April 21, 2023, the trial court signed a new final order that slightly modified the conservators' rights and duties and permitted Chloe's counsel to withdraw. On May 10, 2023, the trial court signed a nunc pro tunc final order, although, apart from Chloe's counsel's signature appearing on the final page of the order, no changes appear to have been made to the April 21, 2023 order.

The Department attempted to e-file a motion to reconsider on June 10, 2023. However, the motion was not file-stamped until June 12, 2023. On July 5, 2023, the trial court signed an order vacating its May 10, 2023 judgment. On August 15, 2023, Chloe filed a challenge to the trial court's jurisdiction, arguing that the 94th Judicial District Court of Nueces County had previously established continuing, exclusive jurisdiction over Alvin, and thus, the trial court's judgment was void. Chloe attached a copy of a final order signed by the 94th District Court on June 6, 2011, to her jurisdictional challenge. On August 25, 2023, the Department filed a motion to transfer, acknowledging that the 94th District Court "has acquired jurisdiction of this suit and of the child, [Alvin], the subject of this suit as a result of prior proceedings." That same day, the trial court granted the Department's motion to transfer and signed its second amended final order.

On September 26, 2023, the trial court heard argument on Chloe's jurisdictional

4

challenge. At the conclusion of the hearing, the trial court denied Chloe's challenge. This appeal and mandamus proceeding followed.[6]

## II. MANDAMUS

Mandamus is an extraordinary and discretionary remedy. *See In re Allstate Indem. Co.*, 622 S.W.3d 870, 883 (Tex. 2021) (orig. proceeding); *In re Garza*, 544 S.W.3d 836, 840 (Tex. 2018) (orig. proceeding) (per curiam); *In re Prudential Ins. Co. of Am.*, 148 S.W.3d 124, 138 (Tex. 2004) (orig. proceeding). "Generally, mandamus relief is appropriate only when (1) there has been a clear abuse of discretion by the trial court, and (2) there is no adequate remedy on appeal." *In re State*, 355 S.W.3d 611, 613 (Tex. 2011) (orig. proceeding). "The relator bears the burden of proving these two requirements." *In re H.E.B. Grocery Co.*, 492 S.W.3d 300, 302 (Tex. 2016) (orig. proceeding) (per curiam); *Walker v. Packer*, 827 S.W.2d 833, 840 (Tex. 1992) (orig. proceeding).

## III. CONTINUING, EXCLUSIVE JURISDICTION

Chloe contends that the trial court did not have jurisdiction to render its final order because another court had continuing, exclusive jurisdiction.

### A. Standard of Review & Applicable Law

A trial court abuses its discretion if it issues a void order, and mandamus will issue to remedy a void order regardless of whether a relator has an adequate remedy by appeal. *In re Sw. Bell Telephone Co.*, 35 S.W.3d 602, 605 (Tex. 2000) (orig. proceeding)

---

[6] On December 12, 2023, this Court sua sponte extended Chloe's deadline to file an appellate brief and notified her that her appeal would be dismissed if she failed to file an appellate brief. However, Chloe has not filed an appellate brief and has instead insisted that the issues she raises must be resolved through mandamus.

(per curiam); *In re J.R.*, 622 S.W.3d 602, 604 (Tex. App.—Fort Worth 2021, orig. proceeding [mand. dism'd]). A judgment is void when the court rendering judgment had no jurisdiction over the parties or property, no jurisdiction over the subject matter, no jurisdiction to enter the particular judgment, or no capacity to act. *In re D.S.*, 602 S.W.3d 504, 512 (Tex. 2020). "We review questions of subject matter jurisdiction de novo." *Sw. Elec. Power Co. v. Lynch*, 595 S.W.3d 678, 682 (Tex. 2020).

A court acquires continuing, exclusive jurisdiction over a parent-child relationship "on the rendition of a final order." TEX. FAM. CODE ANN. § 155.001. "If a court of this state has acquired continuing, exclusive jurisdiction, no other court of this state has jurisdiction of a suit with regard to that child except as provided by this chapter, Section 103.001(b), or Chapter 262." *Id.* § 155.001(c). "[T]he continuing, exclusive jurisdiction statutory scheme is 'truly jurisdictional'—that is, when one court has continuing and exclusive jurisdiction over a matter, any order or judgment issued by another court pertaining to the same matter is void." *In re C.G.*, 495 S.W.3d 40, 44–45 (Tex. App.—Corpus Christi–Edinburg 2016, pet. denied) (first citing *Celestine v. Dep't of Fam. & Protective Servs.*, 321 S.W.3d 222, 229–30 (Tex. App.—Houston [1st Dist.] 2010, no pet.); and then citing *In re Aguilera*, 37 S.W.3d 43, 48–53 (Tex. App.—El Paso 2000, orig. proceeding)).

Chapter 262 of the family code outlines the procedures and provisions that are specific to suits brought by the Department or other governmental entities for the protection of children. *See, e.g.*, TEX. FAM. CODE ANN. ch. 262. "[A]s to emergency and temporary orders, the Chapter 262 court shares jurisdiction with the Chapter 155 court of continuing, exclusive jurisdiction, but not as to final orders." *In re L.S.*, 557 S.W.3d 736,

6

739 (Tex. App.—Texarkana 2018, no pet.) (quoting *In re D.W.*, 533 S.W.3d 460, 465 (Tex. App.—Texarkana 2017, pet. denied)). "The transfer procedures in the family code governing suits affecting the parent-child relationship are the exclusive mechanism for transferring the case or challenging venue and were designed to supplant the regular rules dealing with transfer of venue applicable in ordinary civil cases." *In re C.G.*, 495 S.W.3d at 44.

Upon a timely motion to transfer, a Chapter 262 court may: (1) transfer the suit *to* the court of continuing, exclusive jurisdiction; (2) transfer the suit *from* the court of continuing, exclusive jurisdiction; or (3) transfer the suit to the court having proper venue under Chapter 103. TEX. FAM. CODE ANN. § 262.203(a). As relevant here, a motion to transfer is timely "if filed while the case is pending." *Id.* § 262.203(b). But "[a]n untimely motion to transfer gives a trial court no authority to transfer a cause to another court." *In re C.G.*, 495 S.W.3d at 44.

## B.    Analysis

The Department "does not dispute that a final order relating to [Alvin] was entered in the 94th Judicial District Court in Cause Number 05-04636-00-0-C." Nonetheless, the Department argues, "As the matter was properly transferred prior to entry of the final order, the trial court had jurisdiction to enter the final order." We ultimately agree that the trial court had jurisdiction to enter its final order, but we disagree with the Department as to when that final order was entered.

On May 10, 2023, the trial court signed its nunc pro tunc final order. A motion for new trial or motion to reconsider "shall be filed prior to or within thirty days after the

judgment or other order complained of is signed." TEX. R. CIV. P. 329b(a), (g). The Department's motion to reconsider the May 10 order is file-stamped June 12, 2023.

The Department points to the automatic certificate of e-service, which indicates that the Department attempted to file its motion to reconsider on June 10, 2023. First, we note that "[a]n electronically filed document is deemed filed when transmitted to the filing party's electronic filing service provider, except . . . if a document is transmitted on a Saturday, Sunday, or legal holiday, it is deemed filed on the next day that is not a Saturday, Sunday, or legal holiday." *Id.* R. 21(f)(5)(A). June 10, 2023, was a Saturday. Therefore, the document was not deemed filed until June 12, 2023, a Monday and non-legal holiday. *See id.* But second, and more to the point, thirty days after May 10, 2023, is June 9, 2023, not June 10, 2023. *See id.* R. 4 (entitled "Computation of Time"). Accordingly, the Department's motion to reconsider, even if deemed filed on June 10, 2023, was untimely. *See id.* R. 4, 329b(a), (g). As a result, the trial court lost plenary power over its May 10, 2023 order on June 9, 2023, when no timely motion for new trial or motion to reconsider was filed. *See id.* R. 329b(e), (f); *Bass v. Bass*, 106 S.W.3d 311, 314 (Tex. App.—Houston [1st Dist.] 2003, no pet.). Thus, any action the trial court took after June 9, 2023, is void, and we direct the trial court to vacate the trial court's subsequent orders.

Nonetheless, the trial court's May 10, 2023 order still stands, which does not differ substantially from its subsequent orders. *See State ex rel. Latty v. Owens*, 907 S.W.2d 484, 486 (Tex. 1995) (per curiam). We will address the issues Chloe raises as they pertain to the May 10, 2023 order.

8

Chloe did not raise her jurisdictional challenge until August 15, 2023, long after the trial court's plenary power expired. "A direct attack—such as an appeal, a motion for new trial, or a bill of review—attempts to correct, amend, modify or vacate a judgment and must be brought within a definite time period after the judgment's rendition." *PNS Stores, Inc. v. Rivera*, 379 S.W.3d 267, 271 (Tex. 2012). On the other hand, "[a] collateral attack is any proceeding to avoid the effect of a judgment which does not meet all the requirements of a valid direct attack." *Oropeza v. Valdez*, 147 S.W.3d 480, 482 (Tex. App.—San Antonio 2004, no pet.). Therefore, Chloe's jurisdictional challenge was a collateral attack. *See id.*

"Collateral attacks on final judgments are generally impermissible because 'it is the policy of the law to give finality to the judgments of the courts.'" *In re D.S.*, 602 S.W.3d at 512 (quoting *Browning v. Prostok*, 165 S.W.3d 336, 345 (Tex. 2005)). And "[f]inality is uniquely important in family law matters." *In re D.S.*, 602 S.W.3d at 512. "Only a void judgment may be collaterally attacked." *Browning*, 165 S.W.3d at 346. Thus, "[t]o prevail on a collateral attack, the challenger must show that the judgment is void on its face." *In re A.G.G.*, 267 S.W.3d 165, 169 (Tex. App.—San Antonio 2008, pet. denied).

"[A]s a general rule, extrinsic evidence cannot be considered in a collateral attack to set aside a final judgment." *Mitchell v. MAP Res., Inc.*, 649 S.W.3d 180, 190 (Tex. 2022). "When reviewing a collateral attack, we presume the validity of the judgment under attack." *Johnson v. Ventling*, 132 S.W.3d 173, 177 (Tex. App.—Corpus Christi–Edinburg 2004, no pet.). "A collateral attack fails if the judgment contains jurisdictional recitals, even if other parts of the record show a lack of jurisdiction." *Id.* at 178; *see Lewright v. Manning*,

9

392 S.W.2d 466, 471 (Tex. App.—Corpus Christi–Edinburg 1965, no writ) ("A cardinal principle governing the disposition of collateral attacks on judgments is that extrinsic evidence to the record may not be considered and the recitations in the judgment control.").

The trial court's May 10, 2023 order recited: "The Court, having examined the record and heard the evidence and argument of counsel, finds that this Court has jurisdiction of this case and of all the parties and that no other court has continuing, exclusive jurisdiction of this case." *See Johnson*, 132 S.W.3d at 178. In arguing that the trial court did not have jurisdiction, Chloe points to the order signed by the 94th Judicial District Court that was attached to her jurisdictional challenge. "However, in a collateral attack, our review is limited to the record before the trial court at the time it rendered the challenged judgment." *JD Auto Corp. v. Bell*, --- S.W.3d ---, No. 08-22-00187-CV, 2023 WL 6794342, at *11 n.2 (Tex. App.—El Paso Oct. 13, 2023, no pet.); *see Alderson v. Alderson*, 352 S.W.3d 875, 879 (Tex. App.—Dallas 2011, pet. denied); *see also Topletz v. Wadle*, No. 05-21-00047-CV, 2023 WL 154878, at *5 (Tex. App.—Dallas Jan. 11, 2023, no pet.) (mem. op.).

There is no indication that any party alerted the trial court to the fact that another court may have continuing, exclusive jurisdiction over Alvin. The Department stated in its original petition that it did not believe any court had continuing, exclusive jurisdiction, and Chloe did not contest this until after the trial court's plenary power expired. In fact, on May 23, 2023, while the trial court still had plenary power to modify its final judgment, Chloe averred in her statement of inability to afford payment of court costs that "[t]his court has

continuing jurisdiction of this suit or of the child the subject of this suit." Thus, because we presume the judgment Chloe attacks is valid, and because the record before the trial court at the time it rendered its judgment did not affirmatively negate its jurisdiction, we conclude that Chloe's collateral attack must fail. *See Johnson*, 132 S.W.3d at 177.

Chloe's first issue is sustained in part and overruled in part.[7]

## IV. STANDING

By her second issue, Chloe argues that Janice lacked standing to seek conservatorship of Alvin.

### A. Standard of Review & Applicable Law

"Standing is implicit in the concept of subject matter jurisdiction." *Tex. Ass'n of Bus. v. Tex. Air Control Bd.*, 852 S.W.2d 440, 443 (Tex. 1993). "Standing, like other issues implicating a court's subject matter jurisdiction, is a question of law that we review de novo." *In re H.S.*, 550 S.W.3d 151, 155 (Tex. 2018). "A party seeking conservatorship of a child must have standing to seek such relief." *In re S.M.D.*, 329 S.W.3d 8, 12 (Tex. App.—San Antonio 2010, pet. dism'd). The family code has specific standing provisions for who may bring a custody suit. *See* TEX. FAM. CODE ANN. § 102.003 (providing that, among others, "the Department" has standing to bring a custody suit at any time). Mandamus relief may issue in a custody case when a party lacks standing. *See, e.g.*, *In re Martin*, 523 S.W.3d 165, 169 (Tex. App.—Dallas 2017, orig. proceeding) (collecting cases).

---

[7] We sustain this issue only to the extent Chloe seeks relief from any order entered after the trial court's plenary power expired on June 9, 2023.

11

**B.    Analysis**

Chloe argues: "The nonparent, [Janice], was granted conservatorship, but had no standing to bring a claim or rebut the [fit parent] presumption without being joined to the case."

An individual must have standing if they attempt to seek some sort of relief from the courts. *See, e.g.*, *In re H.S.*, 550 S.W.3d at 155 ("Generally, standing involves a threshold determination of whether a plaintiff has a sufficient 'justiciable interest' in the suit's outcome to be entitled to a judicial determination."). But it is undisputed that Janice was not seeking any relief in this case. Therefore, the issue Chloe raises is not truly one of Janice's standing. Rather, Chloe's argument relates to the Department's ability to seek relief on Janice's behalf and/or the trial court's authority to grant relief to a non-party. This, we conclude, is either an issue of prudential standing (i.e., *the Department* can only "assert [its] own legal rights and interests, and cannot rest [its] claim to relief on the rights or interests of third parties," *see Andrade v. NAACP of Austin*, 345 S.W.3d 1, 16 (Tex. 2011) (quoting *Warth v. Seldin*, 422 U.S. 490, 499 (1975))), or an issue of joinder (i.e., Janice was a necessary party and the trial court had no authority to issue an order without her joinder, *see In re Hall*, 433 S.W.3d 203, 211 (Tex. App.—Houston [14th Dist.], orig. proceeding)).

But regardless of the proper characterization of the issue, in a case where the trial court does not order termination of the parent-child relationship, the court has authority to "render any order in the best interest of the child." TEX. FAM. CODE ANN. § 161.205(2). And the Department indisputably had standing to seek an order for Alvin's protection. *See*

12

*id.* §§ 102.003(a)(6); 262.001(a). Therefore, because this case was initiated by the Department for the purpose of protecting Alvin and because the Department has standing, Janice was not required to be a party with standing for the trial court to appoint her as a managing conservator. *See id.* § 161.205(2); *In re A.D.*, 480 S.W.3d 643, 645 (Tex. App.—San Antonio 2015, pet. denied) ("[W]e cannot agree that the grandparents were required to either be parties to the case or file pleadings in the case before the trial court could appoint them as managing conservators."); *see also In re G.B.*, No. 09-15-00285-CV, 2016 WL 157842, at *7 (Tex. App.—Beaumont Jan. 14, 2016, no pet.) (mem. op.) ("We conclude the Family Code allowed the trial court to name Aunt as G.B.'s managing conservator even though she was never formally named as a party in the proceedings."); *In re R.A.*, No. 10-14-00352-CV, 2015 WL 3646528, at *2 (Tex. App.—Waco June 11, 2015, no pet.) (mem. op.) (holding that trial court had authority to appoint Lopez, a nonparent, as the child's managing conservator "without the necessity of Lopez presenting evidence or otherwise participating in the trial"); *In re Z.G.*, No. 11-11-00078-CV, 2012 WL 745090, at *7 (Tex. App.—Eastland Mar. 8, 2012, no pet.) (mem. op.) (concluding that the trial court did not err by awarding a non-party sole managing conservatorship of a child).

We overrule Chloe's second issue.

## V.    FIT PARENT PRESUMPTION

In her third and fourth issues, Chloe argues that the evidence was insufficient to overcome the fit parent presumption and to demonstrate that appointing Janice, a non-parent, as a managing conservator was in Alvin's best interest.

**A. Background**

Trial commenced on October 17, 2022. We detail the testimony and evidence presented at trial as necessary to resolve our analysis of these issues.

**1. Alvin**

Alvin was the Department's first witness and was sixteen at the time of trial. Alvin discussed the incident at his mother's home that led to his removal. He testified that his sister and Chloe's husband were home when his sister "kept on messing with" him. She then pretended that Alvin "was hitting her and [he] wasn't even hitting her." Then, Chloe's husband "starts hitting [Alvin] with the belt. So, that's when [Alvin] ran away." Alvin explained that Chloe's husband had hit him on other occasions prior to this incident and "left [him with] wel[t]s."

Alvin explained that his mother and sister also hit him occasionally. Alvin also testified that Chloe would encourage his sister, "[H]it him, hit him, so he can hit you back," and then Chloe would call the police on him. Alvin explained that Chloe had lied to the police on prior occasions to get him in trouble.

Alvin described living in Chloe's home as "[a] lot of chaos." He explained that the police have not been called at all since he started living with Janice, and he has not made any suicide threats. He testified that at his current placement with Janice, he is consistent in taking his medication daily, but with Chloe, his medication regimen was inconsistent. Alvin acknowledged that he faced disciplinary actions in the spring because he threatened to kill students at his school. Alvin denied that anyone had coached him into saying he wanted to remain with Janice. Alvin testified that he wanted to join the welding program

14

at his current school and go to college after graduation.

Alvin testified that in-person visits with Chloe had not gone well, as Chloe "was always on her phone" and paid him "no attention." He viewed these visits as "just a waste of time." He explained that he wanted "[n]o contact" with his family. If the court ordered him to live with Chloe, Alvin stated he would feel "Upset. Scared. Worried." He anticipated that Chloe would "call the cops on [him] or try to put [him] in a psych ward just to get rid of [him]." When asked how he would feel if he was taken away from Janice and placed in a group home, Alvin responded, "Still upset, but as long as I just get away from [Chloe]."

He described his current placement with Janice as "fun," "calm," and "[v]ery loving." He explained that he would prefer to stay with Janice because he "feel[s] comfortable," and he "love[s] where [he's] at."

### 2.      Amy Ale

Ale testified that she was a licensed specialist in school psychology at Alvin's current school. Ale provides Alvin with counseling and sees him about "once every four weeks." Ale testified that Alvin "has been identified as having three disabilities." Specifically, he has "an emotional disturbance,"[8] "an intellectual disability," and "ADHD." Ale testified that the school provides Alvin with "academic and behavioral supports."

Ale explained that Alvin did threaten to harm students the previous year. Ale believed that this was a manifestation of Alvin's disability. Specifically, Alvin "can get frustrated when he doesn't necessarily understand what to do or maybe understand the

---

[8] Ale testified that "[t]he school district does kind of a blanket emotional disturbance eligibility," and they do not "diagnose . . . specific—schizophrenia or bipolar disorder. We just do a general umbrella of emotional disturbances and it encompasses a wide range of disabilities." Ale testified that she was unaware of Alvin's specific mental health diagnoses.

social situation and he just reacts at times before stopping to think." Ale testified that Alvin was suspended for a few days due to these threats, but "then he came back at the beginning of the year this year." Ale testified that, as of the week prior to trial, Alvin had not had "any infractions this year so far."

Ale described Alvin the previous year as "hypervigilant" and "very anxious." Ale noticed that Alvin has "become more articulate . . . with his emotions" and "[h]e seems better adjusted." Ale agreed that Alvin was currently failing some of his classes, but that "while his [grades] are not ideal and they are not passing, they are not as low as they could be," and "[t]hey're recoverable." Ale testified that, overall, Alvin's grades, attendance, and behavior had improved. Ale also testified that every time she sees Alvin, "he seems to be doing better."

### 3. Bruce Jeffrey Boswell

Boswell testified that he was a licensed professional counselor and provides Alvin with therapy. Boswell testified that he saw Alvin until April of 2023, at which time Alvin discontinued therapy because "[h]e didn't really see the point of it" and it was "almost traumatizing" to continue "rehashing the same thing." However, Boswell testified that Alvin restarted therapy the Friday prior to trial.

Boswell testified that the subjects they cover in therapy sessions include: "Anxiety. Anger. Behavioral issues such as disrespect towards adults. His schoolwork." Boswell testified that Alvin's "upbringing for the first 13 years" included "a lot of physical abuse, verbal abuse." Alvin "said he was called stupid, dumb. I think retarded. Worthless." Boswell testified that Alvin relayed that "his mother and mother's boyfriend" treated him

this way. Boswell testified that in April, Alvin told him that "he woke up every morning terrified that he was going to have to return home."

Boswell explained that Alvin felt "cared for" and "supported" in his current placement. Boswell testified that Alvin "kind of views [Janice and her son] as his brother and his mother and he's very protective of them." Boswell anticipated that if Alvin was removed from his current placement, "he would be traumatized," and "depending on where his placement was, he would revert back to that and I think we'd end up seeing him back in the juvenile justice system."

### 4. Chester A. "June June" Jones

Jones testified that he was a court-appointed counselor in this case. Jones testified that an in-person counseling session with Chloe, Alvin, and Alvin's current placement took place on May 21, 2023. However, no future in-person visits occurred. There was one additional session via Zoom that both Chloe and Alvin attended. Jones testified that, altogether, he conducted three sessions with Chloe and Alvin, and six sessions with Chloe, Alvin, and Janice.

Jones testified that Janice indicated that the location of the in-person sessions "was too far for her to travel" and that "she was getting very frustrated with [Alvin's] behavior" and "she was getting to a point of even saying that the rate he's going, she's not feeling comfortable with even continuing to have [Alvin] even live with her as well." Jones testified that this raised some red flags because these sessions were court-ordered, and he felt that she was "not respecting the system." Jones testified that he was concerned that Janice was trying to prevent therapy to obtain a certain result in this

17

proceeding. During a phone call with Jones, Janice indicated, "while [Alvin] was in the vehicle with her," that therapy was not working and that she was frustrated with the process. Jones replied, "I just don't feel it's appropriate for you to be mentioning this while [Alvin] is in the vehicle with you."

However, Jones also testified that he had concerns that Chloe lacked accountability and empathy, and that she had a lot of anger. Jones testified that Chloe was in denial about why the Department was involved. Jones also indicated that Chloe was passive-aggressive during some of the therapeutic sessions and that this may have contributed to Alvin not wanting to continue. Jones testified that he did not believe Janice was the driving force behind Alvin not wanting to reunify with Chloe. Jones believed that, based on his last interaction with Chloe, Alvin, and Janice, it would be unsafe for Alvin to return to Chloe's care.

### 5. Chloe

Chloe testified that she wanted her son back home with her and his siblings. Chloe stated that on the night Alvin ran away to Janice's home, she called and texted Janice several times. However, she never learned from Janice that Alvin had contacted her. Rather, a Department investigator informed her of her son's whereabouts the following day. Chloe said she felt "betrayed" by her former friend. Chloe testified that she would not permit Alvin to continue to have a relationship with Janice or with Janice's children.

Chloe acknowledged that she did not consistently provide Alvin with his medication when he was staying with her but testified that "it was very difficult to get him" to comply with taking his medication "because he would get angry." Chloe also testified that Alvin

18

would not always wear his hearing aids because "a teenage boy is very self-conscious . . . and then there was times that he would get angry and he would just throw it and break it."

Chloe denied that her husband had ever hit Alvin. Chloe acknowledged that her husband reportedly admitted to medical professionals that he struck Alvin with a belt, but she denied that Alvin was injured during this incident. Chloe stated that she was "forced to take [Alvin] to the freaking hospital" in November of 2020, "because [the Department's] investigator threatened to file charges on [her] for injury to a child." She also acknowledged that she "may have admitted to" slapping Alvin in the face in September of 2015, but "that was so long ago."'

Chloe described Alvin as "an intelligent kid," "athletic," and "[s]ometimes a comedian." But she also explained that "[s]ometimes he is untruthful." Chloe agreed that she has hit Alvin with a belt on occasion and that this began when Alvin "was little. Like, about ten years old. Nine years old." Chloe testified that Alvin has a history of self-harm that began when he was about "five, six years old." But Chloe believed that Alvin would often express suicidal ideation to try and get out of trouble. Chloe agreed that Alvin had been institutionalized "more than four times." And Chloe agreed that there have been "many times" when she has called the police to have Alvin taken away for mental health concerns.

Chloe acknowledged that Alvin has changed over the past two years, but she believed that Alvin was still violent and described him as "unpredictable." Chloe also acknowledged that she previously told the Department and medical professionals that

19

she feared for her other children because of Alvin's violent tendencies. Chloe did not know how many nights Alvin spent at Janice's home in 2019, stating, "I mean, am I supposed to keep up with all of that? I mean, he's been there a few times."

Chloe acknowledged that all of the professionals who testified had expressed concerns for Alvin's progress and safety should he return to Chloe's home. However, she stated that she "probably would get a different opinion from another professional."

Initially, Chloe testified that she "really ha[d]n't thought . . . out" how to reintegrate Alvin back into her home. However, she later testified that she had "[s]omewhat . . . thought about" how to "slowly transition [Alvin] back" into living with her. Specifically, she testified that she would "probably, like, put him with [step] grandma and then just work it from there." Chloe could not "think of anything else" that could help ease the transition.

### 6. Karolena Froehlich

Froehlich, a caseworker with the Department, testified that "[t]he Department became involved for medical neglect concerns that [Alvin] was not getting his medical needs met, that his hearing devices weren't having the batteries put in them, and that he wasn't getting his medications properly." In September of 2020, Froehlich explained that Chloe and her husband represented that Alvin "had been staying with a friend for a couple weeks," but Janice told the Department that Alvin "had been staying with her for about three months." Froehlich stated that when a Department investigator discussed the possibility of fraud with Chloe, in terms of recovering for Alvin's disability benefits when he was not living with her, Chloe then denied that Alvin had spent any significant amount

of time with Janice.

Froehlich believed that Chloe did not have an adequate plan for bringing Alvin back into the home and that he would potentially be at risk for continued physical and emotional abuse. Froehlich testified that Alvin has "always been very consistent and has always said that he does not want to go back to [Chloe's] home."

Froehlich agreed that Janice had prior felony drug offenses. However, Froehlich testified that the Department requested Janice drug test on several occasions, and the results were negative.

Froehlich testified that Chloe

> has not been able, throughout pretty much the case, to really say much positive things about [Alvin]. They don't have a good relationship. So, the . . . possibility of [Alvin] running away is a very high possibility or him getting himself back in trouble and having law enforcement involved and getting sent back to the juvenile department system is a possibility. Emotional. Possible emotional abuse. Possible physical abuse. So, there's a lot of dangers.

A report authored by Froehlich was admitted into evidence. According to the report, since his placement with Janice, Alvin "feels like he is a part of a family for the first time." This report also indicated that, during a therapy session led by Jones on March 2, 2022, Chloe "lost her temper, let her frustration and anger show, and began to use profanity." When Alvin spoke "about his experience and the abuse he felt when he lived with [Chloe], she responded that he 'is slow', 'he is being manipulated' [and] 'he doesn't know what he is saying.'" Jones reportedly told Froehlich that "neither [Chloe] nor [Alvin] wanted to have an[other] in-person session."

21

### 7.    Other Exhibits

The Department's affidavit in support of removal attested to by Maria Garcia, a Department investigator, was also admitted into evidence. According to the affidavit, on September 28, 2020, Alvin reported to Garcia that he was "fearful" of Chloe, "as in the past she would hit him by 'swinging' at him," and "[d]uring one incident [Alvin] was hit in the eye." Alvin also reported to the Department that "he wants to wear his hearing aid and [Chloe] does not let him wear it." Chloe reported to Garcia that Alvin is supposed to take [his medication] every day but she has not given it to him because she noticed he was gaining weight."

The following day, Garcia visited with Chloe. At the time, Alvin was staying at Janice's home. Chloe reported that if Alvin "returns to the home, the home environment is going to be hostile." Garcia asked Chloe if she had anything positive to say about Alvin, and Chloe responded, "No, there is nothing positive to say about [Alvin]." After this, Alvin returned home. On October 7, 2020, Alvin informed Garcia that Chloe "hit him when he returned home because of what he had disclosed to [t]he Department."

On October 26, 2020, Chloe called the police after Alvin allegedly hit his sister. Chloe explained to the police that Alvin threatened to kill himself. Alvin "was worried that [Chloe] was going to beat him up due to having a meeting set up with" the Department. Alvin "was taken to Northwest Hospital for evaluation."

The following day, Garcia spoke with Chloe and Alvin about this incident. Alvin explained that his sister "came up to him and got into his face and said 'what are you going to do?' [Alvin] said he did not want to argue, so he laid on the couch." Alvin

22

explained "that his sister then came to him and started hitting him and kicking him." Chloe "then intercepted and said that is not what happened." Chloe acknowledged "that she was at work" at the time of the incident, but "she just knew" that it was Alvin who instigated the fight between the siblings. Alvin reported to Garcia that he did not want to be in Chloe's home, because "everyone just makes fun of him, they bully him, and they always blame him for everything."

On November 10, 2020, Janice contacted Garcia and informed her that Alvin "got beat by his step-dead" the previous evening and that she had picked Alvin up when he ran away. Alvin told Garcia that he spilled some water on the ground and his stepfather then "grabbed a belt and started hitting him about 10-13 times." Alvin fell on the ground and his stepfather "continued to hit him with full force while he [was] on the ground covering himself up in a fetal position." Alvin showed Garcia bruising on his "right thigh, right arm, and right hand." Alvin was then taken to Driscoll Children's Hospital for evaluation.

The medical records from this visit were also admitted into evidence. According to these records, in detailing Alvin's medical history, Chloe reported that Alvin "is diagnosed 'with all the mental health problems.'" Chloe also reported that she and her husband "have both used a belt to 'discipline' the patient in the past 'many times.'" A social worker at the hospital expressed "significant concern that the parents are minimizing [Alvin]'s injuries and [Chloe] stated 'it is his fault because he moved.'" Images of Alvin's bruises from this incident were also admitted into evidence.

### 8. Trial Court's Final Judgment

The trial court ultimately appointed Janice and Chloe as joint managing conservators. In its final order, it found "that appointment of a parent or both parents as managing conservator would not be in the best interest of the child . . . because the appointment would significantly impair the child's physical health or emotional development."

### B. Applicable Law & Standard of Review

"A parent's right to 'the companionship, care, custody, and management' of her children is a constitutional interest 'far more precious than any property right.'" *In re D.S.P.*, 210 S.W.3d 776, 778 (Tex. App.—Corpus Christi–Edinburg 2006, no pet.) (quoting *Santosky v. Kramer*, 455 U.S. 745, 758–59 (1982)). "[T]he fit-parent presumption is 'deeply embedded in Texas law' as part of the determination of a child's best interest." *In re C.J.C.*, 603 S.W.3d 804, 812 (Tex. 2020) (orig. proceeding). It is presumed that a fit parent, rather than the court, acts in the best interest of his child. *Id.*

"The test for fitness is whether the parent can adequately care for the child." *In re N.H.*, 652 S.W.3d 488, 494 (Tex. App.—Houston [14th Dist.] 2022, pet. denied). "The language in the Family Code is clear: if sole managing conservatorship by one parent or joint managing conservatorship by both parents would result in significant impairment of a child's physical health or emotional development, the court has wide discretion to appoint conservators in the child's best interest." *In re L.D.F.*, 445 S.W.3d 823, 829 (Tex. App.—El Paso 2014, no pet.). "Where a trial court appoints a parent and nonparent as joint managing conservators, it implicitly rules that [the] parent's sole custody would

24

significantly impair the child's physical health or emotional development." *Id.* at 830.

"Generally, to overcome the fit-parent presumption, a nonparent must prove '"at a minimum" that the physical health or emotional well-being of the child . . . would be significantly impaired if the nonparent were not granted custody.'" *In re K.L.C.*, 672 S.W.3d 734, 743 (Tex. App.—Corpus Christi–Edinburg, no pet.) (quoting *In re J.O.L.*, 668 S.W.3d 160, 166 (Tex. App.—San Antonio 2023, pet. filed)). "Such identifiable behavior or conduct may include '[p]hysical abuse, severe neglect, abandonment, drug or alcohol abuse, or immoral behavior on the part of the parent.'" *Id.* (quoting *Rolle v. Hardy*, 527 S.W.3d 405, 420 (Tex. App.—Houston [1st Dist.] 2017, no pet.)) (alteration in original). "Other considerations may include parental irresponsibility, a history of mental disorders and suicidal thoughts, frequent moves, bad judgment, child abandonment, and an unstable, disorganized, and chaotic lifestyle that has put and will continue to put the child at risk." *In re S.T.*, 508 S.W.3d 482, 492 (Tex. 2015). "A nonparent cannot meet his burden by evidence showing that he would be a better custodian of the children, that he has a strong and on-going relationship with the children, or that the parent would not have been a proper custodian in the past." *Rolle*, 527 S.W.3d at 420.

"[A] finding that appointment of a parent as managing conservator would significantly impair the child's physical health or emotional development is governed by a preponderance-of-the-evidence standard." *In re J.A.J.*, 243 S.W.3d 611, 616 (Tex. 2007). "Conservatorship determinations . . . are subject to review only for abuse of discretion, and may be reversed only if the decision is arbitrary and unreasonable." *Id.* As always, the "primary consideration of the court in determining the issues of conservatorship and

25

possession of and access to the child" is the best interest of the child. TEX. FAM. CODE ANN. § 153.002. In determining the best interest of the child, courts may consider the following non-exhaustive factors:

(1)     the desires of the children;

(2)     the emotional and physical needs of the child now and in the future;

(3)     the emotional and physical danger to the child now and in the future;

(4)     the parental abilities of the individuals seeking custody;

(5)     the programs available to assist these individuals to promote the best interest of the child;

(6)     the plans for the children by the parents;

(7)     the stability of the home or proposed placement;

(8)     the acts or omissions of the parent which may indicate the existing parent-child relationship is not a proper one; and

(9)     any excuse for the acts or omissions of the parent.

*Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976). However, there is no requirement that the trial court hear evidence concerning each of the *Holley* factors, and the trial court is permitted to consider additional factors in determining a child's best interest. *See In re D.M.*, 58 S.W.3d 801, 814 (Tex. App.—Fort Worth 2001, no pet.) (citing *Holley*, 544 S.W.2d at 371–72). "[T]here is a strong presumption that the best interest of a child is served by keeping the child with a parent." *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006) (per curiam). In child protection cases brought by the Department, there is also a presumption that "the prompt and permanent placement of the child in a safe environment is . . . in the child's best interest." TEX. FAM. CODE ANN. § 263.307.

26

"In determining whether to grant mandamus relief, an appellate court should defer to the trial court's factual determinations supported by the record." *In re C.J.C.*, 603 S.W.3d at 811. "The relator must establish that the trial court could reasonably have reached only one decision." *Walker v. Packer*, 827 S.W.2d 833, 840 (Tex. 1992) (orig. proceeding). "Even if the reviewing court would have decided the issue differently, it cannot disturb the trial court's decision unless it is shown to be arbitrary and unreasonable." *Id.*

## C.     Analysis

### 1.     Desires of the Child

The first *Holley* factor considers the child's desires. *See Holley*, 544 S.W.2d at 372. Alvin was sixteen at the time of trial and was able to clearly and articulately explain why he preferred to live with Janice. Specifically, Alvin testified that he felt safe and cared for by Janice, and he was "[s]cared" of returning to Chloe's care. *See* TEX. FAM. CODE ANN. § 263.307(b)(5) (providing that "whether the child is fearful of living in or returning to the child's home" is a factor that should be considered in determining the child's best interest); *Green v. Green*, 850 S.W.2d 809, 813 (Tex. App.—El Paso 1993, no writ) (considering the minor child's preferences in determining whether the trial court's orders concerning visitation and conservatorship were in her best interest). Further, Alvin has consistently and repeatedly expressed that he does not want to return to Chloe's home.

"Evidence that a child is well-cared for by a foster family or a proposed adoptive placement, is bonded to the proposed placement, and has spent minimal time in the presence of the child's parent is relevant to the best interest determination and,

specifically, is relevant to the child's desires." *In re D.M.*, 579 S.W.3d 744, 770 (Tex. App.—Houston [1st Dist.] 2019, no pet.). Froehlich testified that Alvin had never wavered in his desire to remain with Janice and not return to Chloe. Froehlich's report also demonstrated that Alvin felt like he was part of a family for the first time in his life. And Alvin testified that visits with Chloe had not been fruitful.

This factor weighs heavily in favor of the trial court's decision. *See id.*

### 2.    Emotional & Physical Needs of & Danger to Alvin, Now & in the Future

"[T]he prompt and permanent placement of the child in a safe environment is presumed to be in the child's best interest." TEX. FAM. CODE ANN. § 263.307(a). "Conduct that subjects a child to a life of uncertainty or instability endangers the child's physical and emotional well-being." *In re R.A.G.*, 545 S.W.3d 645, 651 (Tex. App.—El Paso 2017, no pet.).

Alvin's basic physical and emotional needs include "food, clothing, shelter, regular medical and dental care, and a safe and nurturing home." *See A.D. v. Tex. Dep't of Fam. & Protective Servs.*, 673 S.W.3d 704, 717 (Tex. App.—Austin 2023, no pet.). Evidence was presented that indicated that Alvin was not provided with necessary medical care or "a safe and nurturing home" while in Chloe's possession. *See id.* Chloe testified that she had a difficult time ensuring that Alvin took his necessary medications and wore his hearing aids because of his anger issues. However, there is evidence in the record that indicates that Chloe refused to provide Alvin with his necessary medication because of his weight gain. Additionally, the affidavit in support of removal reflected that Alvin stated he "wants to wear his hearing aid but [Chloe] does not allow him to wear it." The trial court

28

was entitled to resolve this conflicting evidence in favor of its verdict. *See L.V. v. Tex. Dep't of Fam. & Protective Servs.*, 389 S.W.3d 525, 532 (Tex. App.—El Paso 2012, no pet.).

According to the evidence at trial, Alvin's grades, his attendance, his behavior, his self-esteem, his mental health, and his general outlook on life had all improved since he was placed in Janice's care. *See In re A.J.D.-J.*, 667 S.W.3d 813, 829 (Tex. App.—Houston [1st Dist.] 2023, no pet.) ("[W]e are required to evaluate the evidence holistically and consider its cumulative force, rather than weighing each individual piece of evidence in isolation from the remainder."). The professionals who testified at trial all indicated they feared for Alvin's safety and progress should he be returned to Chloe's care. Further, Alvin repeatedly expressed that he did not feel safe with Chloe, was always belittled and bullied, and was hit with a belt on several occasions. Given the important improvements Alvin has made in Janice's care and given the danger of regression should Alvin be placed with Chloe, we conclude that these factors weigh in favor of the trial court's judgment.

### 3. Parenting Abilities & Programs Available

The fourth and fifth factors concern the parenting abilities of and the programs available to the individuals seeking custody. *See Holley*, 544 S.W.2d at 372. "A parent's past neglect or inability to meet the child's physical or emotional needs may be considered when analyzing her parenting ability." *In re A.H.*, 679 S.W.3d 817, 832 (Tex. App.—El Paso 2023, pet. denied). And "[t]he circumstances that led to the child's removal may be considered as part of the parent's past neglect or inability to meet the child's needs." *Id.*

The trial court could also consider whether a parent appreciated the danger of her

29

behavior. *See In re P.R.W.*, 493 S.W.3d 738, 746 (Tex. App.—Corpus Christi–Edinburg 2016, no pet.). There was testimony that Chloe did not exhibit positive behavior during reunification therapy with Alvin and Janice. Jones testified that Chloe was unable to take accountability for the events that resulted in the Department's intervention. Indeed, although Chloe's husband admitted to medical professionals that he hit Alvin with a belt in November of 2020, Chloe denied that her husband ever assaulted Alvin. *See id.*; *In re E.A.R.*, 583 S.W.3d 898, 913 (Tex. App.—El Paso 2019, pet. denied) (concluding that mother's inability to take accountability for her actions provided "some support for the best interest finding"). Alvin also viewed visits with Chloe as "a waste of time," as she did not interact with him in a positive manner. There was also evidence that Chloe was unable to speak kindly about and to Alvin, which demonstrates that she is unable to meet his emotional needs.

These factors weigh in favor of the trial court's judgment.

### 4. Plans for the Child and Stability of the Home

"The fact finder may compare the parent's and the Department's plans for the child and determine whether the plans and expectations are realistic or weak and ill-defined." *In re U.G.G.*, 573 S.W.3d 391, 403 (Tex. App.—El Paso 2019, no pet.). Chloe initially admitted that she had not given much thought on what it would look like if Alvin was returned to her care. When Chloe had later given it some thought, she testified that she may have Alvin placed with his step grandmother to ease the transition. But there is no indication that Alvin had a positive relationship—or any relationship—with this individual. *See id.*

Alvin wanted to not have any contact with Chloe and to remain in his current placement. According to Alvin, the police had never been called since he was placed in Janice's care, but the police were frequently called while he was with Chloe. Chloe admitted that Alvin was institutionalized on four separate occasions while in her care, but conceded that she had no knowledge that Alvin had been institutionalized since his placement with Janice. Additionally, there was evidence that Chloe physically retaliated against Alvin for speaking with the Department and that his stepfather beat him with a belt for spilling water.

Based on Chloe's ill-defined plans for reintegrating Alvin, and the evidence of the chaos Alvin experienced in Chloe's home versus the evidence of stability in Janice's home, these factors weigh in favor of the trial court's judgment. *See In re S.T.*, 508 S.W.3d at 492.

### 5.    Acts or Omissions & Excuses Therefor

The eighth and ninth factors deal with any acts or omissions on the part of a parent that may indicate the existing parent-child relationship is not a proper one, and whether there are any excuses for those acts or omissions. *See Holley*, 544 S.W.2d at 372.

Chloe wholly denied that Alvin suffered any physical abuse while in her care. However, several witnesses testified that Alvin made outcries of physical abuse. Chloe relayed that Alvin made these allegations "because he didn't get his way," but the trial court was not required to credit Chloe's version of events. *See L.V.*, 389 S.W.3d at 532.

There was also testimony introduced that Alvin suffered emotional abuse while in Chloe's care. Specifically, Boswell testified that Alvin was called "stupid, dumb," and

"[w]orthless" by Chloe and her husband. *See Coburn v. Moreland*, 433 S.W.3d 809, 820 (Tex. App.—Austin 2014, no pet.); *see also In re L.P.*, No. 04-20-00140-CV, 2020 WL 5027385, at *3 (Tex. App.—San Antonio Aug. 26, 2020, pet. denied) (mem. op.) ("Domestic violence includes physical violence as well as emotional abuse such as yelling, threatening, and name-calling and can also involve power and control issues.").

We conclude that these factors weigh in favor of the trial court's judgment.[9]

### 6.    Summary

Once the Department introduced evidence of Chloe's emotional and physical abuse of Alvin, the presumption that she was a fit parent disappeared. *See* TEX. FAM. CODE ANN. § 153.004; *In re H.C.*, 942 S.W.2d 661, 667 (Tex. App.—San Antonio 1997, no writ). Based on this, as well as the other evidence presented at trial that indicated returning Alvin to Chloe's care would result in a significant impairment to his physical and emotional development, we conclude that the trial court did not abuse its discretion by finding that the fit-parent presumption was rebutted. *Cf. In re K.L.C.*, 672 S.W.3d at 743. Additionally, based on our review of the relevant *Holley* factors, we conclude that the trial court did not abuse its discretion in finding that Alvin's best interest was served by appointing Janice as joint managing conservator.[10] Because Chloe has not shown that the trial court abused its discretion and that she lacks an adequate remedy by appeal, we

---

[9] Chloe also argues that the Department conceded "that granting conservatorship to the Department was not in the best interest of the child." But the Department was not granted conservatorship, so we need not address this argument.

[10] We also note that Chloe has not demonstrated that she lacks an adequate remedy by appeal. *See Walker v. Packer*, 827 S.W.2d 833, 842 (Tex. 1992) (orig. proceeding). Although Chloe argues that the delay of an appeal renders it an inadequate remedy, "an appellate remedy is not inadequate merely because it may involve more expense or delay than obtaining an extraordinary writ." *See id.*

overrule Chloe's third and fourth issues and deny the relief she seeks from the trial court's May 10, 2023 order. *See Walker*, 827 S.W.2d at 842.

## VI.  CONCLUSION

The Court, having examined and fully considered the petition for writ of mandamus and the response, is of the opinion that Chloe has shown herself entitled to partial mandamus relief. Accordingly, we conditionally grant the petition for writ of mandamus in part, and we direct the trial court to vacate its orders issued after June 9, 2023. Our writ will only issue if the trial court fails to comply. We deny the petition for writ of mandamus as it pertains to the trial court's May 10, 2023 order.

We dismiss the appeal as moot.

GINA M. BENAVIDES
Justice

Delivered and filed on the
7th day of March, 2024.

33